# MATTOX *v.* UNITED STATES.

ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR THE DISTRICT OF KANSAS.

No. 667. Submitted December 10, 1895. — Decided February 4, 1895.

*Caha* v. *United States,* 152 U. S. 211, followed in holding that the homicide in question in this case having been committed in December, 1889, before the passage of the act organizing the Territory of Oklahoma, was properly cognizable in the Judicial District of Kansas.

When a person accused of the crime of murder is tried in a District Court of the United States, and is convicted, and the conviction is set aside by this court and a new trial ordered, a properly verified copy of the reporter's stenographic notes of the testimony of a witness for the government at the former trial who was then fully examined and cross-examined, and who died after the first trial and before the second, may be admitted in evidence against the accused on the second trial.

The Constitution should be interpreted in the light of the law as it existed at the time it was adopted, not as reaching out for new guaranties of the rights of the citizen, but as securing to every individual such as he already possessed as a British subject — such as his ancestors had inherited and defended since the days of Magna Charta.

Before a witness can be impeached by proof that he has made statements contradicting or differing from the testimony given by him upon the stand, a foundation must be laid by interrogating the witness himself as to whether he has ever made such statements.

PLAINTIFF in error was convicted on January 16, 1894, in the District Court of the United States for the District of Kansas, of the murder of one John Mullen, which was alleged to have

been committed on December 12, 1889, "within that part of the Indian Territory lying north of the Canadian River and east of Texas and the 100th meridian, not set apart and occupied by the Cherokee, Creek, and Seminole Indian tribes, . . . the same being a place and district of country under the exclusive jurisdiction of the United States and within the exclusive jurisdiction of this court." The indictment was returned to the September term, 1891, of the District Court at Wichita, at which term defendant was first tried and convicted. From this conviction he sued out a writ of error from this court, which reversed the judgment of the District Court and remanded the case for a new trial. 146 U. S. 140. The case was continued until the December term, 1893, at which term plaintiff was again put upon his trial, and again convicted, whereupon he sued out this writ of error.

This case was argued on the part of the plaintiff in error and submitted on the part of the defendants in error, on the 23d of October, 1894. On the 3d of December, 1894, leave was granted counsel to file further briefs upon the question of the admissibility of alleged contradictory statements, and it was stated that the cause would then be taken on resubmission to the full bench on briefs, if counsel should so indicate. On the 10th of December it was resubmitted.

*Mr. L. T. Michener, Mr. W. W. Dudley, Mr. Charles R. Redick, Mr. D. C. Lewis, Mr. W. K. Snyder* and *Mr. A. S. Browne* for plaintiff in error.

*Mr. Assistant Attorney General Conrad* for defendant in error.

MR. JUSTICE BROWN delivered the opinion of the court.

Error is assigned to the action of the court below, (1) in assuming jurisdiction of the case; (2) in not remitting the indictment to the Circuit Court for trial; (3) in admitting to the jury the reporter's notes of the testimony of two witnesses at the former trial, who had since died; (4) in refusing to permit the defendant to introduce the testimony of two witnesses to impeach the testimony of one of the deceased witnesses,

upon the ground that the proper foundation had not been laid. We proceed to the consideration of these assignments in their order :

1. The offence was alleged in the indictment to have been committed " within that part of the Indian Territory lying north of the Canadian River and east of Texas and the 100th meridian, not set apart and occupied by the Cherokees, Creeks, and Seminole Indian tribes." By § 2 of the act of January 6, 1883, c. 13, 22 Stat. 400, this territory was expressly "annexed to" and declared " to constitute a part of the United States Judicial District of Kansas." It is true that, by the act of May 2, 1890, c. 182, creating the Territory of Oklahoma, 26 Stat. 81, § 9, jurisdiction over the territory in question was vested in the District Courts of that Territory, but with a reservation that " all actions commenced in such courts," (viz., courts held beyond and outside the limits of the Territory,) " and *crimes committed* in said Territory and in the Cherokee Outlet, prior to the passage of this act, shall be tried and prosecuted, and proceeded with until finally disposed of, in the courts now having jurisdiction thereof, as if this act had not been passed." As the homicide in question was committed in December, 1889, there can be no question but that it was properly cognizable in the Judicial District of Kansas. Indeed, this point is disposed of by the decision of this court in *Caha* v. *United States*, 152 U. S. 211.

2. We are also of opinion that there was no error in not remitting the indictment to the Circuit Court for trial, and in assuming jurisdiction of the entire case. Rev. Stat. § 1039, requiring indictments in capital cases, presented to a District Court, to be remitted to the next session of the Circuit Court for the same district, and there to be tried, has no application to this case, since the subsequent act of January 6, 1883, 22 Stat. 400, to which we have already called attention, vests in the United States District Courts at Wichita and Fort Scott in the District of Kansas " exclusive original jurisdiction of all offences committed within the limits of the Territory hereby annexed to said District of Kansas, against any of the laws of the United States." This act should be read as a qualification

of sec. 1039, or a repeal *pro tanto* of the requirement that indictments shall be remitted to the Circuit Court for trial. A District Court could not be said to have "exclusive original jurisdiction" of a case which it was obliged to remit to another court for trial.

3. Upon the trial it was shown by the government that two of its witnesses on the former trial, namely, Thomas Whitman and George Thornton, had since died, whereupon a transcribed copy of the reporter's stenographic notes of their testimony. upon such trial, supported by his testimony that it was correct, was admitted to be read in evidence, and constituted the strongest proof against the accused. Both these witnesses were present and were fully examined and cross-examined on the former trial. It is claimed, however, that the constitutional provision that the accused shall "be confronted with the witnesses against him" was infringed, by permitting the testimony of witnesses sworn upon the former trial to be read against him. No question is made that this may not be done in a civil case, but it is insisted that the reasons of convenience and necessity which excuse a departure from the ordinary course of procedure in civil cases cannot override the constitutional provision in question.

The idea that this cannot be done seems to have arisen from a misinterpretation of a ruling in the *case of Sir John Fenwick*, 13 Howell's State Trials, 537, 579 *et seq.*, which was a proceeding in Parliament in 1696 by bill of attainder upon a charge of high treason. It appeared that Lady Fenwick had spirited away a material witness, who had sworn against one Cook on his trial for the same treason. His testimony having been ruled out, obviously because it was not the case of a deceased witness, nor one where there had been an opportunity for cross-examination on a former trial between the same parties, the case is nevertheless cited by Peake in his work on Evidence (p. 90) as authority for the proposition that the testimony of a deceased witness cannot be used in a criminal prosecution. The rule in England, however, is clearly the other way. Buller's N. P. 242; *King v. Jolliffe*, 4 T. R. 285, 290.; *King v. Radbourne*, 1 Leach Cr. Law, 457; *Rex v. Smith*,

2 Starkie, 208; *Buckworth's case*, T. Raym. 170. As to the practice in this country, we know of none of the States in which such testimony is now held to be inadmissible. In the cases of *Finn* v. *Commonwealth*, 5 Rand. (Va.) 701; *Mendum* v. *Commonwealth*, 6 Rand. (Va.) 704; and *Brogy* v. *Commonwealth*, 10 Grattan, 722, the witnesses who had testified on the former trial were not dead, but were out of the State, and the testimony was held by the Court of Appeals of Virginia to be inadmissible, though the argument of the court indicated that the result would have been the same if they had been dead. In the case of *State* v. *Atkins*, 1 Overton, 229, the former testimony of a witness since deceased was rejected by the Supreme Court of Tennessee, but this case was subsequently overruled in *Kendrick* v. *State*, 10 Humphrey, 479, and testimony of a deceased witness taken before a committing magistrate was held to be admissible. See also *Johnston* v. *State*, 2 Yerger, 58; *Bostick* v. *State*, 3 Humph. 344. The rule in California was formerly against the admission of such testimony; *People* v. *Chung Ah Chue*, 57 California, 567; *People* v. *Qurise*, 59 California, 343; but it is now admitted under a special provision of the code applicable to absent and deceased witnesses, which is held to be constitutional. *People* v. *Oiler*, 66 California, 101. In the case of *State* v. *Campbell*, 1 Rich. (S. C.) 124, the testimony of a deceased witness had been taken before a coroner, but in the absence of the accused, and of course it was held to be inadmissible.

Upon the other hand, the authority in favor of the admissibility of such testimony, where the defendant was present either at the examination of the deceased witness before a committing magistrate, or upon a former trial of the same case, is overwhelming. The question was carefully considered in its constitutional aspect by the Supreme Judicial Court of Massachusetts in *Commonwealth* v. *Richards*, 18 Pick. 434, in which it was said that "that provision was made to exclude any evidence by deposition, which could be given orally in the presence of the accused, but was not intended to affect the question as to what was or was not competent evidence to be given face to face according to the settled

rules of the common law." The subject was also treated at great length by Judge Drummond in *United States* v. *Macomb,* 5 McLean, 286, and the substance of a deceased witness's testimony given at a preliminary examination held to be admissible. All the cases up to that time were cited in the opinion, and the decision put upon the ground that, the right of cross-examination having once been exercised, it was no hardship upon the defendant to allow the testimony of the deceased witness to be read. From the following list of cases it will be seen that the same doctrine prevails in more than a dozen States. *Summons* v. *State,* 5 Ohio St. 325; *Brown* v. *Commonwealth,* 73 Penn. St. 321: in both of which cases the question was elaborately considered. *State* v. *McO'Blenis,* 24 Missouri, 402; *State* v. *Baker,* 24 Missouri, 437; *State* v. *Houser,* 26. Missouri, 431 — a most learned discussion of the subject; *State* v. *Able,* 65 Missouri, 357; *Owens* v. *State,* 63 Mississippi, 450; *Barnet* v. *People,* 54 Illinois, 325; *United States* v. *White,* 5 Cranch C. C. 457; *Robinson* v. *State,* 68 Georgia, 833; *State* v. *Wilson,* 24 Kansas, 189; *State* v. *Johnson,* 12 Nevada, 121; *Roberts* v. *State,* 68 Alabama, 515; *State* v. *Cook,* 23 La. Ann. 347; *Dunlap* v. *State,* 9 Tex. App. 179; *O'Brian* v. *Commonwealth,* 6 Bush, 563; *State* v. *Hooker,* 17 Vermont, 658; *Crary* v. *Sprague,* 12 Wend. 41; *United States* v. *Wood,* 3 Wash. C. C. 440; *State* v. *Valentine,* 7 Iredell, (Law,) 225. While the precise question has never arisen in this court, we held in *Reynolds* v. *United States,* 98 U. S. 145, that if the witness is absent by the procurement or connivance of the defendant himself, he is in no condition to assert his constitutional immunity.

The primary object of the constitutional provision in question was to prevent depositions or *ex parte* affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he

gives his testimony whether he is worthy of belief. There is doubtless reason for saying that the accused should never lose the benefit of any of these safeguards even by the death of the witness; and that, if notes of his testimony are permitted to be read, he is deprived of the advantage of that personal presence of the witness before the jury which the law has designed for his protection. But general rules of law of this kind, however beneficent in their operation and valuable to the accused, must occasionally give way to considerations of public policy and the necessities of the case. To say that a criminal, after having once been convicted by the testimony of a certain witness, should go scot free simply because death has closed the mouth of that witness, would be carrying his constitutional protection to an unwarrantable extent. The law in its wisdom declares that the rights of the public shall not be wholly sacrificed in order that an incidental benefit may be preserved to the accused.

We are bound to interpret the Constitution in the light of the law as it existed at the time it was adopted, not as reaching out for new guaranties of the rights of the citizen, but as securing to every individual such as he already possessed as a British subject — such as his ancestors had inherited and defended since the days of Magna Charta. Many of its provisions in the nature of a Bill of Rights are subject to exceptions, recognized long before the adoption of the Constitution, and not interfering at all with its spirit. Such exceptions were obviously intended to be respected. A technical adherence to the letter of a constitutional provision may occasionally be carried farther than is necessary to the just protection of the accused, and farther than the safety of the public will warrant. For instance, there could be nothing more directly contrary to the letter of the provision in question than the admission of dying declarations. They are rarely made in the presence of the accused; they are made without any opportunity for examination or cross-examination; nor is the witness brought face to face with the jury; yet from time immemorial they have been treated as competent testimony, and no one would have the hardihood at this day to question

their admissibility. They are admitted not in conformity with any general rule regarding the admission of testimony, but as an exception to such rules, simply from the necessities of the case, and to prevent a manifest failure of justice. As was said by the Chief Justice when this case was here upon the first writ of error, (146 U. S. 140, 152,) the sense of impending death is presumed to remove all temptation to falsehood, and to enforce as strict an adherence to the truth as would the obligation of an oath. If such declarations are admitted, because made by a person then dead, under circumstances which give his statements the same weight as if made under oath, there is equal if not greater reason for admitting testimony of his statements which were made under oath.

The substance of the constitutional protection is preserved to the prisoner in the advantage he has once had of seeing the witness face to face, and of subjecting him to the ordeal of a cross-examination. This, the law says, he shall under no circumstances be deprived of, and many of the very cases which hold testimony such as this to be admissible also hold that not the substance of his testimony only, but the very words of the witness, shall be proven. We do not wish to be understood as expressing an opinion upon this point, but all the authorities hold that a copy of the stenographic report of his entire former testimony, supported by the oath of the stenographer that it is a correct transcript of his notes and of the testimony of the deceased witness, such as was produced in this case, is competent evidence of what he said.

4. Error is also assigned to the action of the court in refusing to permit the defendant to introduce the testimony of two witnesses, James and Violet, to impeach the testimony of Whitman, one of the deceased witnesses, by showing statements made by him contradicting his evidence upon the stand, upon the ground that the proper foundation had not been laid by interrogating Whitman himself as to his having made such contradictory statements.

In this connection the defendant proposed to prove by the witness James that Whitman told him in November, 1892, that he did not see Mattox on the night he did the shooting,

because it was too dark; that he could not tell who did the shooting; that on the next day he told him that all that he had testified to on the former trial was false, and that he wanted to leave the country; and that if he, witness, would go to see his (Mattox's) friends and get him fifty dollars, he would give him (witness) twenty-five and himself take twenty-five, and leave the country; that he did not want to appear against Mattox because what he had sworn to was not true. He also sought to prove by the witness Violet that in January, 1892, Whitman said emphatically and specifically that his testimony against Mattox was given under threats made to him in the corridors of the court-house in Wichita; that just prior to his being called to the witness stand he was approached by one Stiles, who shook his finger in his face and told him that if he dared to utter one word on the witness stand in favor of defendant Mattox, he (Stiles) would see that he was sent over the road; further declaring that if it had not been for such threats his testimony would not have been given as it was.

Objection was made by the district attorney to the introduction of this testimony upon the ground that Whitman had been examined and cross-examined upon the former trial; that the questions could not be propounded to the witnesses James and Violet for the purpose of impeachment, as the government had lost the opportunity, by the death of the witness Whitman, of putting him upon the stand and contradicting them. The facts were that the statements of Whitman, which the defendant proposed to prove by the witnesses James and Violet, were made after the former trial, so that the proper foundation could not have been laid by asking Whitman whether he had made such statements.

The authorities, except in some of the New England States, are almost unanimous to the effect that, before a witness can be impeached by proof that he has made statements contradicting or differing from the testimony given by him upon the stand, a foundation must be laid by interrogating the witness himself as to whether he has ever made such statements. Justice to the witness himself requires, not only that he should

be asked whether he had ever made such statements, but his attention should be called to the particular statement proposed to be proven, and he should be asked whether, at such a time and place, he had made that statement to the witness whose testimony is about to be introduced.   This method of impeachment was approved by this court in *Conrad* v. *Griffey*, 16 How. 38, 46, wherein the rule is stated to be " founded upon common sense, and is essential to protect the character of a witness.   His memory is refreshed by the necessary inquiries, which enable him to explain the statements referred to, and show that they were made under a mistake, or that there was no discrepancy between them and his testimony."   In this case the deposition of a witness taken in the cause was sought to be impeached by a letter of the witness written before his deposition, and addressed to the plaintiff, with an affidavit annexed by him of the same date.   The general rule is also approved in *The Charles Morgan*, 115 U. S. 69, 77, although in that particular case it was held that proper foundation had been laid for the introduction of the evidence.   The principle was also approved in *Chicago, Milwaukee &c. Railway* v. *Artery*, 137 U. S. 507.

It is insisted, however, that the rule ceases to apply where the witness has died since his testimony was given, and the contradictory statements were either made subsequent to the giving of his testimony, or, if made before, were not known to counsel at the time he was examined; that if such contradictory statements be not admitted, the party affected by his testimony is practically at the mercy of the witness; that the rule requiring a foundation to be laid is, after all, only a matter of form, and ought not to be enforced where it works a manifest hardship upon the party seeking to impeach the witness.   The authorities, however, do not recognize this distinction.   It is true that in *Wright* v. *Littler*, 3 Burrow, 1244, 1255, the dying confession of a subscribing witness to a deed that he had forged the instrument was admitted by Lord Chief Justice Willes, and afterwards approved by the Queen's Bench, Lord Mansfield delivering the opinion, and that similar evidence was admitted in *Aveson* v. *Kinnaird*, 6

East, 188, 196; but the authority of these cases was seriously shaken by *Stobart* v. *Dryden*, 1 M. & W. 615, in which it was held that the defendant could not give evidence of declarations made by a subscribing witness to a deed, who had since died, tending to show that he had forged or fraudulently altered the deed. In this connection it was said by Baron Parke that, "if we had to determine the question of the propriety of admitting the proposed evidence, on the ground of convenience, apart from the consideration of the expediency of abiding by general rules, we should say that at least it was very doubtful whether, generally speaking, it would not cause greater mischief than advantage in the investigation of truth. . . . If any declarations at any time from the mouth of subscribing witnesses who are dead are to be admitted in evidence, . . . the result would be, that the security of solemn instruments would be much impaired. The rights of parties under wills and deeds would be liable to be affected at remote periods, by loose declarations of attesting witnesses, which those parties would have no opportunity of contradicting, or explaining by the evidence of the witnesses themselves. The party impeaching the validity of the instrument would, it is true, have an equivalent for the loss of his power of cross-examination of the living witness; but the party supporting it would have none for the loss of his power of reëxamination."

The case of *Ayers* v. *Watson*, 132 U. S. 394, 404, differs principally from the one under consideration in the fact that it was a civil instead of a criminal case. It was an action of ejectment, in which the defendant introduced the deposition of one Johnson, taken in 1878 or 1880 — a surveyor who had made a survey of the land in question. His deposition had been twice taken and used upon former trials, but prior to the last trial he had died. Plaintiff, in rebuttal, offered a deposition of the witness taken in 1860 in a suit between other parties, in which his testimony in regard to the matters to which he testified in the deposition offered by defendant varied materially from these latter depositions. The deposition was held to be inadmissible, Mr. Justice Miller observ-

ing : " While the courts have been somewhat liberal in giving the opposing party an opportunity to present to the witness the matter in which they propose to contradict him, even going so far as to permit him to be recalled and cross-examined on that subject after he has left the stand, it is believed that in no case has any court deliberately held that after the witness's testimony has been taken, committed to writing and used in the court, and by his death he is placed beyond the reach of any power of explanation, then in another trial such contradictory declarations, whether by deposition or otherwise, can be used to impeach his testimony. Least of all would this seem to be admissible in the present case, where three trials had been had before a jury, in each of which the same testimony of the witness Johnson had been introduced and relied on, and in each of which he had been cross-examined, and no reference made to his former deposition nor any attempt to call his attention to it. This principle of the rule of evidence is so well understood that authorities are not necessary to be cited."

The cases in the state courts are by no means numerous, but these courts, so far as they have spoken upon the subject, are unanimous in holding that the fact that the attendance of the witness cannot be procured, or even that the witness himself is dead, does not dispense with the necessity of laying the proper foundation. Thus in *Stacy* v. *Graham*, 14 N. Y. 492, 499, counsel, while conceding the rule, relied upon two circumstances to relieve the case from its influence. The first was, that the attendance of the witness could not be procured at the time of the trial; and the second, that the declarations and statements offered to be proved were made after the witness had testified, and were a direct admission that he had sworn falsely. It was held that, if the statements came to the knowledge of counsel afterwards and before the trial, it was his duty to apply for a commission or move a postponement until the evidence could be procured. "The mere absence of the witness," said the court, " has never been considered a reason for allowing his unsworn statements to be proved in order to affect his credibility." The question was

further elaborately considered in *Runyan* v. *Price*, 15 Ohio
St. 1, 11, 12, in which one of the subscribing witnesses to a
will had died before the trial, and his testimony taken at the
probate of the will was read in evidence. The contestants
then offered evidence of his declarations respecting the capac-
ity of the alleged testator to make a will at the time the one
in question purported to have been made; but these were
held, though by a bare majority of the court, to be inadmissi-
ble for the purpose of impeaching his testimony.

"It seems to us," said the court, "that to allow the death of
the witness to work an exception would be to destroy the prin-
ciple upon which the rule rests, and deny the protection which
it was designed to afford. . . . In relieving one party of
a supposed hardship an equally serious one might be inflicted
upon the other. . . . Without, therefore, the opportunity
to the witness of explanation, or, to the party against whom
offered, of reëxamination, we are of opinion that the sup-
posed declarations lack the elements of credibility which they
should possess before they can be used legitimately to destroy
the testimony of the witness." This case was approved in
the subsequent case of *Wroe* v. *State*, 20 Ohio St. 460, 472, in
which the statement of a person alleged to have been mur-
dered as to the manner in which he received the wound, which
statement was claimed to be inconsistent with his dying dec-
larations, was ruled out upon the ground that it was neither
a part of the *res gestæ* nor was it a dying declaration. It was
held to be incompetent as original evidence or as impeaching
testimony. "To admit it would, to some extent, afford a sub-
stitute to the defendant for the loss of cross-examination, but
it would deprive the deceased and the State of all opportunity
for explanation." In *Craft* v. *Commonwealth*, 81 Kentucky,
250, it was held that where the testimony of a witness, given
upon a former trial, was reproduced, the witness having died,
testimony to the effect that the witness, subsequent to the
former trial, stated that the evidence given by him on that
trial was false, was not competent. The rule is put upon the
ground that if the impeaching statements were admitted there
would be a strong temptation to the fabrication of testimony,

by which important and true evidence might be destroyed. So in *Hubbard* v. *Briggs*, 31 N. Y. 518, 536, the testimony of a deceased witness given on a former trial of the case was read in evidence. Subsequently the defendant offered to read the deposition of this witness in a chancery suit, for the purpose of contradicting his evidence as read, and impeaching him. The testimony was held to have been properly ruled out, no foundation having been laid for it. The fact that the witness was dead was held not to change the rule. See also *Griffith* v. *State*, 37 Arkansas, 324; *Unis* v. *Charlton*, 12 Grattan, 484; *Kimball* v. *Davis*, 19 Wend. 437.

While the enforcement of the rule, in case of the death of the witness subsequent to his examination, may work an occasional hardship by depriving the party of the opportunity of proving the contradictory statements, a relaxation of the rule in such cases would offer a temptation to perjury, and the fabrication of testimony, which, in criminal cases especially, would be almost irresistible. If it were generally understood that the death of a witness opened the door to the opposite party to prove that he had made statements conflicting with his testimony, the history of criminal trials leads one to believe that witnesses would be forthcoming with painful frequency to make the desired proof. The fact that one party has lost the power of contradicting his adversary's witness is really no greater hardship to him than the fact that his adversary has lost the opportunity of recalling his witness and explaining his testimony would be to him. There is quite as much danger of doing injustice to one party by admitting such testimony as to the other by excluding it. The respective advantages and disadvantages of a relaxation of the rule are so problematical that courts have, with great uniformity, refused to recognize the exception.

There was no error in the action of the court below and its judgment is, therefore,

*Affirmed.*

MR. JUSTICE SHIRAS dissenting, with whom concurred MR. JUSTICE GRAY and MR. JUSTICE WHITE.

Clyde Mattox, the plaintiff in error, was tried and convicted of murder in the first degree at September term, 1891, of the District Court of the United States for the District of Kansas. He prosecuted a writ of error to this court, where the judgment of the lower court was reversed, and the case remanded for a new trial. At a subsequent term of the same court a second trial was had, which resulted in a disagreement of the jury; and at December term, 1893, the plaintiff in error was put upon his third trial. He was found guilty, and upon the judgment condemning him to death the present writ of error was taken.

On the last trial of this case the government proved that two of its witnesses on the first trial, Thomas Whitman and George Thornton, had died subsequently thereto, and introduced in evidence, against the objection of the defendant, the notes of their testimony taken down by a stenographer at the prior trial.

The defendant offered to show, by two witnesses, that Whitman, the deceased witness, and whose testimony, preserved in the notes of the stenographer, was necessary to secure a conviction, had, after the former trial, and on two distinct occasions, stated that his testimony at the former trial was given under duress, and was untrue in essential particulars.

The government objected to this evidence, on the ground that the usual foundation had not been laid for the impeachment of the witness by having his attention called to his alleged contradictory statements, and that the death of the witness disabled the government from denying or explaining the statements attributed to him.

The action of the court in sustaining the objection of the government and refusing to admit the impeaching testimony is the only subject of discussion in this opinion.

It is, doubtless, the general rule in the trial of both civil and criminal cases that before testimony can be introduced to discredit a witness by showing that at another time and place he had made statements inconsistent with those made at the trial, he must be asked whether he had made such statements.

This is to give the witness an opportunity either to deny that
he made the statements attributed to him, or to explain by
showing that such statements, though made, were reconcil-
able with his testimony, or, perhaps, to withdraw or modify
his testimony in the light of a refreshed recollection.

But this general rule is not a universal one, and does not
prevail in some courts of very high authority, and Wharton
correctly says that in Maine and Massachusetts this rule is
not enforced, and in Pennsylvania it is left to the discretion
of the judge trying the case to observe it or not. 11 Whart.
Crim. Law, § 819.

In *Tucker* v. *Welsh*, 17 Mass. 160, the subject was discussed,
and the Supreme Judicial Court of Massachusetts, after refer-
ring to *The Queen's case*, 2 Brod. & Bing. 284, 300, declined
to follow the rule there laid down, and held that the credit of
a witness who has testified orally or by giving his deposition
may be impeached by showing that he has made a different
statement out of court, either before or after he has given his
testimony, and that it is not necessary that the impeached
witness be first inquired of as to such different statement, or
that he be present when his credit is to be impeached. We
shall take occasion hereafter to advert to an observation made
by Chief Justice Parker in the course of the opinion.

The subject was also considered by the Supreme Court of
Connecticut in the case of *Hedge* v. *Clapp*, 22 Connecticut, 262,
and that court declined to accept the rule in *The Queen's case*,
preferring the course followed in Massachusetts. It is clearly
shown in this opinion that the rule is not a substantive rule
of the law of evidence, but is merely one of practice. "In
this State," says Chief Justice Church, "we do not believe
there has been a uniformity of usage in conducting the exami-
nation of witnesses who have made contradictory statements
out of court, since *The Queen's case*, although, before that
time, a contradiction of a witness might be proved without
qualification. . . . We conclude, therefore, that the legal
profession here has never considered the law on this subject
to be fixed, but has treated the subject rather as a matter of
practice in the examination of witnesses, and subject to the

discretion of the court. We do not very well see how an unyielding rule can be prescribed in conformity with the rule claimed, which shall apply consistently in all cases."

However, it must be conceded that the rule has been approved by this court in several cases cited in the majority opinion.

In *Conrad* v. *Griffey*, 16 How. 38, where a letter was written six years before a deposition was taken which the letter was offered to discredit, this court said that it was not probable that, after the lapse of so many years, the letter was in the mind of the witness when his deposition was sworn to, and that the rule requiring the attention of the witness to be called to his prior contradictory statements was a salutary one, and should not be dispensed with in the courts of the United States.

But the question now for consideration is not whether there is such a general rule, but whether it is subject to any exceptions, and particularly whether the facts of the present case do not justify a departure from the rule.

An examination of the authorities will show, as I think, no such current or weight of decision as to preclude this court from dealing with the question as an open one.

The case of *Ayres* v. *Watson*, 132 U. S. 394, is referred to in the majority opinion as differing from the present one only in the fact that it was a civil instead of a criminal case. It is indeed true that it was a civil case, a not unimportant difference, but there was another feature in that case which deprives it of all force as a precedent for our guidance in the question we are now considering. The case there was this: In an action of ejectment which went through several trials, the deposition of one Johnson, a surveyor, taken in 1878, was introduced by one of the parties. This deposition had been twice taken, and used upon the former trials, and prior to the last trial the witness had died. At the last trial the opposite party offered in rebuttal a deposition of the witness taken in 1860, in a suit between other parties, and in which were contained statements materially different from those contained in the later depositions. This court held that, as Johnson's deposition had in three trials been introduced and relied on, in each of which he

had been cross-examined, and no reference was made to his former deposition, nor any attempt to call his attention to it, such prior deposition could not be used after his death to impeach his testimony, and the court said that "this principle of the rule of evidence is so well understood that authorities are not necessary to be cited." It is apparent that, in that case, the opposing party had no less than three opportunities to call the attention of the witness to the existence of his prior deposition, and to cross-examine him upon it. In the present case the contradictory statements sought to be proved were not made till after the prior trials, and therefore there was no opportunity, at any time, for the defendant to call the witness's attention to such statements and to cross-examine upon them. The case of *Ayres* v. *Watson* cannot, therefore, be fairly regarded as at all in point.

No other decision of this court is cited, nor any of the Circuit Courts of the United States. The only English cases cited are three, *Wright* v. *Littler*, 3 Burrow, 1244, 1255; *Aveson* v. *Kinnaird*, 6 East, 188; and *Stobart* v. *Dryden*, 1 M. & W. 615; in the two former of which it was held that confessions of a subscribing witness to a deed that he had forged the deed, could be admitted in evidence in a trial after his death, and in the latter that such confession could not be admitted. The reasons given for excluding the testimony seem to have been chiefly based upon the impolicy of permitting the security of solemn instruments to be impaired by loose declarations of attesting witnesses, and, perhaps, partly upon the general grounds of public policy mentioned by Lord Mansfield in *Walton* v. *Shelley*, 1 T. R. 296, when he said "it is of consequence to mankind that no person should hang out false colors to deceive them, by first affixing his signature to a paper, and then afterwards giving testimony to invalidate it." It is, therefore, clear that neither this decision, nor the reasons given to support it, furnish any answer to our present inquiry.

Some decisions of state courts are cited, but the most of them seem to have little or no bearing on the exact question we are discussing.

*Stacy* v. *Graham*, 14 N. Y. 492, was a case where the witness, whose testimony it was proposed to contradict by declarations made elsewhere, was not dead, but merely absent from the court-room, and it was said, " the mere absence of the witness has never been considered a reason for allowing his unsworn statements to be proved in order to affect his credibility." This case, therefore, was merely an application of the general rule.

In *Runyan* v. *Price*, 15 Ohio St. 1, it was held, by three judges against two, that, in a civil case, the testimony of a deceased witness could not be impeached by giving in evidence declarations alleged to have been made by him out of court differing from those contained in his testimony. *Wroe* v. *State*, 20 Ohio St. 460, 472, was a case in which statements made by a deceased person as to the manner in which he received the fatal wound were ruled out because they were neither *res gestæ* nor dying declarations.

*Craft* v. *Commonwealth*, 81 Kentucky, 250, was a case in which the majority opinion in *Runyan* v. *Price* was cited and followed, and testimony offered to contradict a deceased witness by his own subsequent declarations, as to which he had not been examined, was excluded.

In *Hubbard* v. *Briggs*, 31 N. Y. 536, it was unsuccessfully sought to impeach a witness, who had testified at a former trial of the case in 1863, and afterwards died, by offering his deposition taken twenty years before in a chancery suit between different parties. This was a civil suit, and there had been a stipulation of the parties that the evidence of the witness might be read as he gave it on a former trial. The decision can be sustained on obvious principles apart from the question in hand.

*Griffith* v. *State*, 37 Arkansas, 324, 331, was a case where the Supreme Court of Arkansas recognized the general rule that it is not competent to contradict a witness by evidence of declarations made out of court without directing his attention to the subject, but the court said: " The court ruled out the impeachment evidence offered on the trial, because it did not appear from the statement of the deceased witness, made on

cross-examination, as reduced to writing by the magistrate, that his attention had been directed to the time and place of the antecedent declarations. This may or may not have been so, and though strictly the ruling of the court was right, it might have been safer, in a case involving liberty, to give the accused the benefit of the doubt."

*Unis* v. *Charlton*, 12 Grattan, 484, was merely a case illustrating the general rule, and not bearing on our problem. *Kimball* v. *Davis*, 19 Wend. 437, was only to the effect that a living witness, whose testimony had been taken on deposition, cannot be contradicted by his subsequent declarations, where he has not been cross-examined in respect to them, but that the only way for a party to avail himself of such declarations is to sue out a second commission. This is obviously merely a recognition of the general rule, and does not touch the present case.

The entire array of cases cited seems to resolve itself into two cases only in which the question was directly considered and decided: *Runyan* v. *Price*, 15 Ohio St. 1, a civil case ruled by a divided court, and *Craft* v. *Commonwealth*, 81 Kentucky, 250.

In *Hedge* v. *Clapp*, 22 Connecticut, 262, heretofore cited, the court said that while the rule laid down in *The Queen's case* was one to which it would be very well to adhere, yet "it should be subject to such exceptions as a sound discretion may from time to time suggest."

Chief Justice Parker, in *Tucker* v. *Welsh*, 17 Mass. 160,167, said: "It has been suggested that, admitting such evidence proper to impeach a witness who is upon the stand, it ought not to be allowed to impeach a deposition, the witness being absent and having no opportunity to deny or explain. The witness who has testified upon the stand hears, it is true, the evidence which tends to impeach him, or he may be called back for that purpose if he be absent: so where the evidence goes to affect the credibility of a deposition, if it be material, the court would give time for the principal witness to appear or for other depositions to be taken relative to the facts which are proved to impeach him. It may sometimes be inconven-

ient, but if justice requires delay it would be given. Suppose a witness who has once testified should afterwards acknowledge the falsity of his statements and then die; the party interested in his testimony might upon another trial prove what he had once said upon the stand under oath; and shall not the other party be permitted to prove that what he said was a falsehood?"

In *Fletcher* v. *Fletcher*, 5 La. Ann. 406, the rule in *The Queen's case* was approved, and testimony to impeach a witness by showing contradictory statements was ruled out because the necessary foundation had not been laid.

But in *Fletcher* v. *Henley*, 13 La. Ann. 191, 192, such evidence was admitted where it was shown that a seasonable but fruitless effort had been made to examine the witness as to his alleged contradictory statements by taking out a commission for that purpose, but where the return to the commissioner showed that he could not be found.

This brief review of the authorities suffices to show that this question, in the shape in which it is now presented, has never heretofore been considered or decided by this court, and that there has been no such uniform current of decisions in other courts as to constrain us to follow it.

Finding, then, no decisive rule in the authorities, and coming to regard the question as one of reason, it is at once obvious that we are dealing not with any well-settled doctrine of law, prescribed by statute or by a long course of judicial decisions, but with a mere rule of procedure. Undoubtedly, the credit of witnesses testifying under oath should not be assailed by evidence of their statements made elsewhere, without affording them, if practicable, in justice to them and to the party calling them, an opportunity to deny, explain, or admit; but it must not be overlooked that the primary object of the trial is not to vindicate the truth or consistency of witnesses, but to determine the guilt or innocence of the accused. If the evidence tending to show that the testimony of an essential witness cannot be relied on, because he has made contradictory statements elsewhere and at other times, is valid and admissible, as the authorities all concede,

why should the right to put in such evidence be destroyed by the incidental fact that the witness, by reason of death, cannot be produced to deny or to admit that he made such statements? Does not the necessity call for a relaxation of the rule in such a case?

The books disclose many instances in which rules of evidence, much more fundamental and time-honored than the one we are treating, have been dispensed with, because of an overruling necessity.

Thus, the rule which excluded parties from being witnesses was departed from when it was deemed essential to the purposes of justice. In *Clark* v. *Spence*, 10 Watts, 335, it was said : " A party is not competent to testify in his own cause; but, like every other general rule, this has its exceptions. Necessity, either physical or moral, dispenses with the ordinary rules of evidence. In cases against common carriers, the owner has been admitted, *ex necessitate*, to testify to the contents and value of boxes that have been opened and rifled," (see other cases cited by Greenleaf, vol. 1, §§ 348, 349,) and that author sums up the cases by stating : " Where the law can have no force but by the evidence of the person in interest, there the rules of the common law, respecting evidence in general, are presumed to be laid aside; or rather, the subordinate are silenced by the most transcendent and universal rule, that in all cases that evidence is good, than which the nature of the subject presumes none better to be obtainable."

In *United States* v. *Murphy*, 16 Pet. 203, 210, the owner of property, alleged to have been stolen on board an American vessel, on the high seas, was held to be a competent witness to prove the ownership of the property stolen, the court saying: "The general rule undoubtedly is, in criminal cases as well as in civil cases, that a person interested in the event of the suit or prosecution is not a competent witness. But there are many exceptions which are as old as the rule itself. Thus, it is stated by Lord Chief Baron Gilbert as a clear exception, that where a statute can receive no execution unless a party interested be a witness, there he must be allowed; for the statute

must not be rendered ineffectual by the impossibility of proof."

But we need not go beyond the very case before us for a striking illustration of the fact that rules of evidence, even when founded in a constitutional provision, may be modified or relaxed when the necessities of a case so require.

The government could not proceed, at the third trial, without producing the testimony of Thomas Whitman and George Thornton. But those witnesses had both died since the prior trials, and the government was driven to rely upon a stenographer's notes of their testimony. It was objected, on behalf of the accused, that the Constitution provides that "in all criminal prosecutions the accused shall enjoy the right . . . to be confronted with the witnesses against him," and it was contended that the word "confront" does not simply secure to the accused the privilege of examining witnesses in his behalf, but is an affirmance of the rule of common law that, in trials by jury, the witness must be present before the jury and the accused, so that he may be confronted — that is, put face to face. But this court, in the opinion of the majority, disposes of this objection by saying: "The primary object of the constitutional provision in question was to prevent depositions on *ex parte* affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of a personal examination and cross-examination of the witness, in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief. There is doubtless reason for saying that the accused should never lose the benefit of any of these safeguards, even by the death of the witness; and that, if notes of his testimony are permitted to be read, he is deprived of the advantage of that personal presence of the witness before the jury which the law has designed for his protection. *But general rules of law of this kind, however beneficent in their operation and valuable to the*

*accused, must occasionally give way to considerations of public policy and the necessities of the case."*

If, then, the right of the accused to confront the witnesses against him, although formally secured to him by the express terms of the Constitution, and being of that importance and value to him as are recognized by the court, may be dispensed with because of the death of a witness, it would seem justly to follow that neither should that death deprive the accused of his right to put in evidence valid and competent in its nature, to show that the witness was unworthy of belief, or had become convinced, after the trial, that he had been mistaken.

It is argued that to permit evidence of statements made by a witness contradictory of his testimony would be "a strong temptation to the fabrication of evidence, by which important and true evidence might be destroyed." This argument overlooks the fact that if witnesses are introduced to testify to the contradictory statements, those witnesses are liable to indictment for perjury. They testify under the sanction of an oath, and of a liability to punishment for bearing false witness. On the other hand, the witness, the notes of whose testimony are relied on as sufficient to secure a conviction of the accused, is no longer within the reach of human justice.

To conclude: The rule that a witness must be cross-examined as to his contradictory statements before they are given in evidence to impeach his credit, is a rule of convenient and orderly practice, and not a rule of the competency of the evidence.

To press this rule so far as to exclude all proof of contradictory statements made by the witness since the former trial, in a case where the witness is dead, and the party offering the proof cannot, and never could, cross-examine him as to these statements, is to sacrifice substance of proof to orderliness of procedure, and the rights of the living party to consideration for the deceased witness.

According to the rulings of the court below, the death of the witness deprived the accused of the opportunity of cross-examining him as to his conflicting statements, and the loss

of this opportunity of cross-examination deprived the accused of the right to impeach the witness by independent proof of those statements; and thus, while the death of the witness did not deprive the government of the benefit of his testimony against the accused, it did deprive the latter of the right to prove that the testimony of the witness was untrustworthy. By this ruling the court below rejected evidence of a positive character, testified to by witnesses to be produced and examined before the jury, upon a mere conjecture that a deceased witness might, if alive, reiterate his former testimony. It would seem to be a wiser policy to give the accused the benefit of evidence, competent in its character, than to reject it for the sake of a supposition so doubtful.

The judgment of the court below ought to be reversed, and the cause remanded, with directions to set aside the verdict and award a new trial.