# Richmond.

PARKS v. COMMONWEALTH.

January 21, 1909.

1. CRIMINAL LAW.—*Evidence—Death of Witness Between Trials—Proof of Former Testimony.*—If a witness for the prisoner in a criminal prosecution has been examined and cross-examined at one trial and dies before a second trial of the case, his testimony given on the first trial may be proved by the prisoner on the second trial. *Finn's Case*, 5 Rand. 701, and *Brogy's Case*, 10 Gratt. 722, explained.

Error to a judgment of the Circuit Court of Scott county.

*Reversed.*

The opinion states the case.

W. S. Cox, for the plaintiff in error.

Robert Catlett, Assistant to the Attorney General, for the Commonwealth.

WHITTLE, J., delivered the opinion of the court.

The accused, Ira Parks, brings error to a judgment of the Circuit Court of Scott county, whereby he was convicted of voluntary manslaughter, and sentenced accordingly.

The first assignment of error is to the action of the court in excluding the testimony given by the wife of the plaintiff in error on a former trial of the case.

The witness testified at the first trial and was cross-examined

by the Commonwealth's attorney, and, having died before the second trial, the accused sought to prove her testimony, but the court refused to admit the evidence.

• Although the doctrine of the admissibility of such evidence is well settled both in England and in this country, the precise question never seems to have been decided by this court. *Finn's Case*, 5 Rand. 701, and *Brogy's Case*, 10 Gratt. 722, are relied on by the Attorney General to maintain the rule of exclusion; but an examination of those cases will show that the court was dealing with witnesses absent from the Commonwealth, and not such as had died after a previous examination. Some of the authorities hold that manifestly different principles apply to the two classes of witnesses.

*Finn's Case* was decided by the general court in 1827, and the statement of the learned judge who delivered the opinion, that although in a civil action proof might be given of the former testimony of a witness since dead, the rule was otherwise in a criminal prosecution, was purely *obiter dictum,* since, as remarked, the witness in that case was not dead but absent from the Commonwealth.

In *Brogy's Case,* the court quoted with approval the *dictum* in *Finn's Case,* without discussing the principle involved, or citing any other authority.

*Cite's Case,* 1 Va. Dec. 423, recognizes the fact that the question is an open one in Virginia; but the court declined to decide the point, because it did not arise in that case.

In considering the doctrine, Wigmore in his work on Evidence, at section 1398, observes: "In dealing with *depositions* and *former testimony,* our courts have almost unanimously received them in criminal prosecutions, as not being obnoxious to the constitutional provision. The leading opinions were rendered chiefly between 1840 and 1860. Up to 1886, apparently the only contrary precedent not overruled was an early Virginia case, afterwards often cited, which professed to decide the question merely on English precedent, and not on

constitutional grounds, and proceeded on the authority of an earlier English treatise, which in turn went upon the authority of Fenwick's trial—a parliamentary decision precisely to the opposite effect, and misunderstood by the writer for the treatise. This early Virginia ruling, of so little weight in itself, served however to keep a doubt alive; and in the last generation a few ill-considered rulings in other jurisdictions have followed it. Apart from these rulings, it is well and properly settled that such evidence—assuming always that there has been a due cross-examination—is admissible for the State in a criminal prosecution, without infringing the Constitution." The discussion of the subject is continued in subsequent sections, and the authorities are collected and digested in notes, with later decisions cited, in Volume V (supplement) under the same sections.

An interesting review of *Fenwick's Case,* 4 St. Trials, 265, will be found in 2 Va. Lew Reg. 807.

The doctrine of the admissibility of such evidence is also exhaustively treated by Mr. Justice Brown in *Mattox* v. *U. S.,* 156 U. S. 237, 39 L. Ed. 409, 15 Sup. Ct. 337. The learned justice, after declaring the rule well settled in England, says: "As to the practice in this country, we know of none of the States in which such testimony is now held to be inadmissible." See also *Reynolds* v. *U. S.,* 98 U. S. 145, 25 L. Ed. 244; *West* v. *Louisiana,* 194 U. S. 258, 48 L. Ed. 965, 24 Sup. Ct. 650.

It would indeed present an anomalous state of the law to admit such evidence in civil cases, involving property rights merely, and to apply the rule of exclusion to criminal cases, involving life and liberty, when the introduction of such evidence is not infrequently of controlling weight, either in bringing the guilty to punishment on the one hand, or of shielding the innocent on the other.

We are of opinion that this assignment is well taken, and that the trial court erred in excluding evidence of the former testimony of the deceased witness.

The next assignment concerns the ruling of the court upon instructions. A brief statement of the essential facts of the case, with respect to which there is no serious conflict, will tend to elucidate the objections to the court's ruling under this assignment.

The accused had employed David Robbins to move his effects from the land of his mother-in-law, Mrs. Sarah Gilliam, where he had been living, to a farm which he and his wife had recently purchased. The wagon was standing in the public road close to the yard fence in front of the house. Robbins was in the wagon loading the furniture and household goods as Parks would pass them up to him. For the most part, the loading was done by handing the furniture over the tence, but some of the articles were carried through a gap in the fence to the back of the wagon and loaded from that position. While the loading was in progress, Samuel Gilliam, the deceased, a son of Mrs. Sarah Gilliam, came up to the yard fence, near the front end of the wagon tongue, and said to Parks, who was on the inside of the fence engaged about his work: "Don't you take them windows out of the house." To which Parks replied: "I am not going to take them out." Gilliam then turned to Mrs. Parks and said: "Don't you take them out." She said: "I bought them and have paid for them, and I am going to take them out." Continuing, Gilliam remarked to Parks: "You have already taken some of the plank off that shed down there." Which Parks denied, and Gilliam rejoined: "It's a d—d lie, you have." Parks iterated the denial; and Gilliam said: "You have, I will swear it and can prove it." Parks thereupon stated: "If you swear it, you will swear a d—d lie, and if you prove it, you will prove a d—d lie."

Robbins then interferred and said: "This must be stopped; I am not going to have any trouble here." But Gilliam continued the altercation, saying to Parks: "You cannot come out in the road and talk that way"; to which Parks replied: "I

can talk it anywhere. I will have to be in the road loading the wagon, and you go away and let me alone."

Parks had walked up about the porch and was standing on the steps. About that time he started out into the road through the gap in the yard fence near the hind end of the wagon, he says, with the foot-board of a bed-stead in his hand. Robbins says he did not see anything in his hand when he came out in the road, but he adds: "I was in the wagon, busy, and Parks was handing the things in to me." Witness further stated that when Parks was in the yard he was nearer to Gilliam than he was at the rear end of the wagon, and there was nothing to have prevented him from shooting Gilliam before he went into the road, had he been so disposed; that if Gilliam had remained where he was standing by the fence, witness would have been directly between him and Parks. Continuing, he says: "I looked and saw Sam Gilliam coming up towards the front wheel of the wagon on the opposite side from the fence. When he got about the center of the fore-wheel, I saw he had his pistol out in his right hand (indicating and pointing his hand toward the floor in front of him at an angle of about 40 or 45 degrees)." Witness then turned his eyes towards Parks, who was standing at the hind end of the wagon, about the hind wheel next to the road, and he had his pistol pointed toward Gilliam, and the shooting instantly began. "I thought at the time Gilliam had shot, but he didn't."

Parks' statement is that he saw Gilliam advancing on him, and just as he reached the front wheel of the wagon, "he threw his pistol on me, and I drew mine and fired as quick as I could. It was all done in an instant." He declared that he did not go into the road for a difficulty; that he had a man hired and had to go on with his work; that he shot Gilliam because he honestly believed he intended to kill him. He fired four shots, two of which took effect.

The plaintiff in error excepted to the giving of instructions 1, 2, and 3 on behalf of the Commonwealth; and also to the

court's modification of his instructions 3, 5 and 7. The trend of all these instructions is to qualify or abridge the right of self-defense upon which the accused relies as an excuse for the homicide, on the assumption that he, to some extent at least, was instrumental in bringing on the difficulty.

In view of the fact that the case is to be remanded for a new trial, we shall abstain from commenting on the evidence further than to remark that we do not think it justifies an instruction founded on the theory that the accused provoked the difficulty.

For these reasons, the judgment complained of must be reversed, the verdict of the jury set aside, and the case remanded for further proceedings.

. *Reversed.*