283 So.2d 81 (1973)
STATE of Louisiana, Appellee,
v.
Oscar SAM, Jr., Appellant.
No. 53222.
Supreme Court of Louisiana.
August 20, 1973.
Rehearing Denied September 24, 1973.
Woodson T. Callihan, Jr., Baton Rouge, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., LeRoy A. Hartley, Special Asst. Atty. Gen., Ossie Brown, Dist. Atty., Ralph L. Roy, Asst. Dist. Atty., for plaintiff-appellee.
TATE, Justice.
The defendant was indicted for murder, La.R.S. 14:30, and convicted after trial by jury of manslaughter, La.R.S. 14:31, a responsive verdict. He appeals. At least two of the seventeen bills of exceptions reserved present reversible error.
Bills Nos. 10 and 11 were taken when the State was allowed to introduce deposition testimony of an allegedly unavailable witness. In introducing this constitutionally disfavored form of testimony, which has the effect of limiting the defendant's right of cross-examination in the light of other trial testimony and of depriving him of demeanor-evaluation by the trial jury, the State made no real showing, as will be stated more fully, that the witness was not available for live testimony.
I. Context Facts
The victim ("Elma") was found dead on July 3rd. She and the defendant had been living together in her apartment for about a year. However, in June, after a violent argument, she made the defendant leave the apartment.
During the month of separation, the defendant had repeatedly attempted reconciliation with the victim Elma, sometimes cajoling, sometimes threatening. He hung around her (formerly their) apartment, parked all night in the adjacent parking lot, called her repeatedly, knocked on her door without success, etc.
The victim was found dead in the apartment at 3:30 to 4:00 P.M. on July 3rd. She had been stabbed and choked. She was found in an overflowing bathtub, and the cause of her death was drowning. (She was found because of complaints by tenants on a lower floor of water leakage through the ceilings.)
The medical examiner estimated the time of death at some six to eight hours earlier *82 than his examination of 5:45 P.M.  i. e., between 9:45 A.M. and 11:45 A.M. , with possibly an hour's leeway either way.
On the day of her death, the victim left her apartment before 8:00 A.M. to visit her mother and to do some shopping. She returned at about 9:00 A.M. and was never seen alive again by any witness.
The witnesses at the trial, all neighbors in the apartment house, testified that the defendant Sam was seen in the vicinity on July 3rd, the day of the crime, as follows: in the parking lot, walking around, at one time standing on the ground beneath the decedent's second floor window, between 3:00 and 4:45 A.M. (and still there at the latter time) (Watson and Williams); at 3:00 A.M. in the parking lot, and again at about 8:00 to 8:15 A.M. taking down the screen to the kitchen window of the decedent's apartment (Latham son; positive as to time because the witness had to be at work at 8:30); at 8:00 A.M., when he passed a neighbor's window and knocked at the decedent Elma's door, and at 8:05 A. M., when he passed back and went down the stairs (Latham mother); and at about 9:15-9:30 A.M. when he was seen walking hurriedly from the apartment building to the parking lot (the Stewarts, husband and wife).
It is in this context that the State introduced, over objection, the deposition testimony of Larry Bellizan, a 15-year-old high school boy. This testimony had been taken at a preliminary examination on July 22, 1971, some six months before the trial. The State introduced this deposition testimony on its contention that this witness was unavailable for the trial.
At the preliminary examination, Bellizan testified (a) that he had seen the defendant go in the decedent's apartment at 11:00 A.M. (a time of which he was positive)[1] and come out some ten minutes later; (b) that between 11:00 A.M., when he got up, and 3:00 P.M., when he left for the barber shop, no one else had come to the apartment. His further testimony indicates he was an eleventh grade student at a nearby high school.
The examination and cross-examination as to where he was when he observed the defendant and how consecutive and detailed his observation was of other possible visitations was at best sketchy. This might be expected of a pre-indictment preliminary examination principally directed to probable cause for a charge for the offense with which held, La.C.Cr.P. Art. 296. However, the clear inference of the testimony is that the defendant entered the apartment openly and normally.[2]
*83 This deposition testimony was extremely damaging to the defendant. In the first place, this is the only witness who actually saw the defendant enter the decedent's apartment. In the second place, the testimony that the defendant entered the apartment at 11:00 A.M. is the only testimony that the decedent was clearly at the scene after the victim Elma had returned home, and it is the only testimony to place him there within the medical estimate of the probability of death between 9:45 A.M. and noon. In the third place, it is the only testimony to tend to exclude the possibility that the murder was committed by someone who came to the apartment later than the defendant. Moreover, the limited examination of this witness deprived the defendant of the opportunity to reconcile the deposition testimony with that of other witnesses or to explore the discrepancies.
The defense produced no witnesses. In closing argument, the defendant's counsel primarily relied upon the discrepancy between the time of death (10:00 A.M. to noon) and the fact that the defendant was seen leaving the scene at 9:15 to 9:30. Counsel also strongly suggested that some other lover might have killed the decedent.
The importance of Bellizan's testimony to the State's case may be measured by the numerous, extensive and repeated references to it during the State's closing argument (Tr. 867-887; see Tr. 875-876, 877-78, 881, 883, 884) and during the State's rebuttal argument (Tr. 904-912, see, e. g., 903-04, 907).
The trial jury itself had difficulty in arriving at a verdict. See Bill of Exceptions No. 17. After a period of deliberation, the jury informed the court that it was not able to reach a verdict. The trial judge ordered the jury to return for further deliberation. After it did, the jury agreed on the compromise verdict of guilty of manslaughter rather than murder as charged.
II. The Applicable Legal Principles
We have gone to some detail to illustrate that, if inadmissible, substantial prejudice was caused to the accused by improper admission of the deposition testimony of Bellizan. However, if the deposition testimony was erroneously admitted, reversal is required because of the substantial violation of the constitutional and statutory right of the accused not to be deprived of his right of confrontation of the witness and of trial-jury evaluation of the witness' demeanor, unless such witness is shown to be unavailable.
In speaking of the right of confrontation guaranteed to the accused in state trials by the Sixth and Fourteenth Amendments to the federal constitution, the United States Supreme Court stated in Barber v. Page, 390 U.S. 719, 721, 88 S.Ct. 1318, 1320, 20 L.Ed.2d 255 (1968): "Many years ago this Court stated that `[t]he primary object of the [Confrontation Clause of the Sixth Amendment] * * * was to prevent depositions or ex parte affidavits * * * being used against the prisoner in lieu of a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.' Mattox v. United States, 156 U.S. 237, 242-243, 15 S.Ct. 337, 339, 39 L.Ed. 409 (1895). More recently, in holding the Sixth Amendment right of confrontation applicable to the States through the Fourteenth Amendment, this Court said, `There are few subjects, perhaps, upon which this Court and other courts have been more nearly unanimous than in their expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal.' Pointer v. State of Texas, 380 U.S. 400, 405, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965). See also Douglas v. State of Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L. Ed.2d 934 (1965)."
*84 As defendant admits, Barber v. Page indicates that the state may nevertheless introduce such testimony taken at a preliminary examination "where the witness is shown to be actually unavailable," 390 U.S. 725-726, 88 S.Ct. 1322, provided adequate opportunity for cross-examination was afforded at the preliminary examination. See California v. Green, 399 U.S. 149, 165-169, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1965). The defendant contends, however, that the state did not adequately show that the witness was unavailable for the trial.
In Barber v. Page, a state conviction was reversed because the state made no effort to obtain the live presence of an out-of-state witness. The preliminary-examination testimony of this witness, at which cross-examination by the accused's counsel was permissible, was introduced at the merit-trial of the defendant.
In its unanimous reversal of the state conviction, the Supreme Court stated, "In short, a witness is not `unavailable' for purposes of the foregoing exception to the confrontation requirement unless the prosecutorial authorities have made a good-faith effort to obtain his presence at the trial." 390 U.S. 724-725, 88 S.Ct. 1322. The court concluded, 390 U.S. 725-726, 88 S.Ct. 1322: "The right to confrontation is basically a trial right. It includes both the opportunity to cross-examine and the occasion for the jury to weigh the demeanor of the witness. A preliminary hearing is ordinarily a much less searching exploration into the merits of a case that a trial, simply because its function is the more limited one of determining whether probable cause exists to hold the accused for trial. While there may be some justification for holding that the opportunity for cross-examination of a witness at a preliminary hearing satisfies the demand of the confrontation clause where the witness is shown to be actually unavailable, this is not, as we have pointed out, such a case."
Article 295 of our Code of Criminal Procedure permits to be introduced at the trial the preliminary-examination testimony of witnesses other than the defendant, "if the court finds that the witness ... cannot be found."[3]
The state argues that Bellizan's preliminary-examination testimony could be introduced at the merit-trial because he was unavailable and could not be found. The state introduced no testimony to this effect but simply relies upon the sheriff's return of December 22, 1971, to a subpoena to Bellizan issued on December 17, 1971. The return was dated one month and two days before the trial date of January 24, 1972.
The address of Bellizan shown on the subpoena is his address at the time of the preliminary examination some five months earlier. Without further elaboration, the sheriff's return checked printed descriptive phrases: "Unable to locate" and "Moved to unknown", the last italicized word being completed in ink.
The state's assistant district attorney argues that the sheriff's return, without more, is an adequate showing that the witness could not be found and that the state had made a good faith effort to locate him. The state's argument to the trial court, Tr. 328, stated that State v. Nelson, 261 La. 153, 259 So.2d 46 (1972), just decided and then not yet reported, was authority to such effect.
*85 The Nelson decision is not cited in the state's brief to this court; for it is, if anything, authority to the contrary. There, the preliminary-examination testimony of an unavailable witness was not admitted at the trial until a showing had been made by sworn testimony of an investigator (who had attempted to locate the unavailable witness, without success, by following all leads, checking utility and credit bureau records) and of a friend of two years (who testified that the witness's whereabouts were unknown). See also State v. Johnson, 261 La. 620, 260 So.2d 645 (1972).
As in State v. Augustine, 252 La. 983, 215 So.2d 634 (1968), we must reverse. There is no showing that the witness has been diligently sought without avail or that the prosecution has made a good-faith effort to secure the witness' presence at the trial,[4] in the absence of which showing the defendant's constitutional and statutory rights to have the live-witness testify before the trial jury were violated by the introduction of the deposition testimony. See also State v. Jones, 261 La. 422, 259 So.2d 899 (1972).

Decree
For the reasons assigned, we reverse the conviction and sentence appealed from and we remand for a new trial.
Reversed and remanded.
SUMMERS, J., dissented and filed opinion.
MARCUS, J., dissented.
SUMMERS, Justice (dissenting).
I would not reverse this conviction by presuming that the sheriff did not perform his duty in attempting to find the witness. To the contrary, the law presumes that officials have performed their duties, and a return on the subpoenae that the witness could not be found should be adequate in the absence of proof to the contrary.
I respectfully dissent.
NOTES
[1] Bill No. 12 was taken when a subsequent witness (Latham son) testified that Bellizan was outside the apartment house at about 8:00 A.M., as distinguished from Bellizan's positive testimony that he did not get out of bed until 11:00 A.M. The basis for the bill is the objection that the State was improperly attempting to impeach its witness Bellizan's testimony, although the testimony did not surprise nor was hostile to the State. La.R.S. 15:487, 488. The trial court properly overruled this objection, since it does not impeach one's own witness to introduce other witnesses who testify contrary to the first. La.R.S. 15:489. However, included within the testimony attached to the bill was hearsay testimony perhaps subject to a well-founded objection of this nature. (See Footnote 2).
[2] This may be relevant, because in the testimony of Latham son attached to Bill No. 12 (see Footnote 1) is that witness' statement that Bellizan had informed him, in reply to his question, that some "cat" had gone through the decedent's kitchen window while Latham was gone. (After Latham had seen the defendant tampering with the window screen, he thought nothing of it because he was familiar with the man and thought he lived there and had forgotten his key. He had gone to his own apartment, returning shortly afterwards to see Bellizan and ask him, "Did a cat go through the window?") This testimony by Latham of Bellizan's out-of-court statement an hour or so before the murder, is clearly hearsay and inadmissible unless excepted as part of the res gestae. A third person's narration of a past event, in response to interrogation, is not admissible as part of the res gestae. La.R.S. 15:447; State v. Willis, 241 La. 796, 131 So.2d 792 (1961); State v. Gustopolis, 169 La. 707, 125 So. 862 (1930). The hearsay testimony of an illegal entry was extremely prejudicial in view of the State's repeated arguments that the murder resulted during commission of a burglary and was therefore a felony murder regardless of specific intent.
[3] Article 295 provides in full: "The transcript of the testimony of a defendant who testified at the preliminary examination is admissible against him upon the trial of the case or, if relevant, in any subsequent judicial proceeding.

"The transcript of the testimony of any other witness who testified at the preliminary examination is admissible for any purpose in any subsequent proceeding in the case, on behalf of either party, if the court finds that the witness is dead, too ill to testify, absent from the state, or cannot be found, and that the absence of the witness was not procured by the party offering the testimony.
"The transcript of testimony given by a person at a preliminary examination may be used by any party in a subsequent judicial proceeding for the purpose of impeaching or contradicting the testimony of such person as a witness." (italics ours)
[4] For instance, the preliminary examination testimony shows that the witness Bellizan was a high school studentthere is no showing that an effort had been made to check the school he attended to learn if he was there, or where he had transferred. The trial evidence shows his mother's name; there is no showing of any effort to locate her and from her the where-abouts of her son.