[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 494 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 495 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 496 
The testimony of Adams, the witness by whom the principal facts in the case were proved, has been commented upon by the appellant's counsel as unworthy *Page 497 
of credit, and it certainly presents an account of the transaction not altogether satisfactory. The jury, however, under proper instructions, have passed upon his evidence, and we must take the case as he states it. This court has no power to entertain questions of the credibility of evidence; and even where a witness delivers contradictory or inconsistent statements, and the jury have thought proper to believe one of them in preference to another, we have no right to interfere. It is to be assumed, therefore, that the plaintiffs were the owners of the brig Venus, and were entitled to the moneys in question arising from the condemnation and sale of the vessel in Brazil; and that by an arrangement with Adams, who was the master, the defendant received the money, agreeing, after retaining a certain sum on account of a previous loan to Adams, to take or transmit the balance to the wife of the latter in Massachusetts, where the plaintiffs also resided, for their benefit. The object of the remittance to Mrs. Adams was to place the money where the plaintiffs would get it, although it does not appear that this was mentioned in the arrangement made with the defendant.
Upon these facts no demand was necessary in order to maintain the action. The defendant received the fund under a positive duty to remit, and having violated that duty he became immediately liable. He may not have known that the remittance was to be made ultimately on account of the plaintiffs, and it may be that he had never heard of them. This can make no difference. He was not, in any point of view, to hold the money until called for, but was to send it forward. It is no answer to an action of this character that a demand has not been made, unless there is something in the agreement under which the money was received, or in the circumstances attending the deposit, implying a right or duty to hold it until actually called for by the owner.
The necessity of a demand has been argued from a letter of the defendant to the plaintiffs, written more than two years after the transaction. If that letter had been the only *Page 498 
evidence of the defendant's possession of the fund and of the terms or instructions under which he received it, a demand would probably have been necessary. But the facts which have been stated were proved, as the jury have found, by other testimony, and the letter did not weaken their force.
The question of interest depends essentially upon the same considerations. If the defendant received the money, not upon any trust to hold it for the parties to whom it belonged, but under instructions to remit, the right to recover interest cannot be questioned. The failure to remit according to the arrangement testified to by Adams fully justified a presumption that the fund had been converted by the recipient.
The testimony of the witness, Adams, had been taken de benecsse, under the statute, and was read at the trial on the part of the plaintiffs. After they had rested, relying, as it would seem, mainly upon this evidence, the defendant offered to prove conversations with that witness after his examination, in which he confessed that his evidence was false; that he had given it under threats; that he regretted what he had sworn to, c. It was further offered to be shown that in these conversations Adams gave an account of the transaction in question wholly inconsistent with his testimony, but consistent with what he had said about the time the facts occurred. It has been strenuously and ably argued that the judge erred in excluding the evidence so offered.
The rule does not appear to be uniform in all the states that, in order to impeach a witness by proving previous declarations made by him inconsistent with his evidence, he must first be interrogated as to what he has said. (17 Mass., 160; 6 N.H.,
465; 5 Conn., 557; 8 Greenl., 42.) It prevails, however, so generally that the cases which are the other way cannot now be considered as authority. The doctrine is well settled in England, and in this state it has now become so familiar that the authorities need not be cited. *Page 499 
The appellant's counsel, conceding the existence of the rule, relies upon two circumstances to relieve the present case from its influence. The first is, that the evidence of the witness sought to be impeached was taken before the trial in the form of a deposition, which being read at the trial of course implied that the witness was not present, and that his attendance could not be procured at that time. The second is, that the declarations and statements offered to be proved were made after the witness had testified, and were a direct admission that he had sworn falsely.
If the rule in question is founded upon any good reason (and of this we do not admit a doubt), there can be none for discriminating in the case of a deposition taken before the trial. If the party against whom the witness is examined knows of the inconsistent statements which he expects to prove at the trial, he can attend and propose such interrogatories as the rule requires in order to lay the proper foundation for the intended impeachment. If he does not know at the time, but the statements come to his knowledge afterwards and before the trial, he can apply for a commission or move a postponement until the evidence can be procured, if he thinks it material to his case. The mere absence of the witness has never been considered a reason for allowing his unsworn statements to be proved in order to affect his credibility. Suppose the evidence, instead of being taken in the form of a deposition, is delivered at the trial, and the witness has left the court before the other party is aware that he has made inconsistent declarations which may tend to discredit him: every lawyer knows that this is of frequent occurrence at the circuit, but the rule in question has never yielded to this exigency; on the contrary, such a case has been put as the very strongest illustration of the fitness and necessity of the rule itself. (The Queen's case, 2 Brod. Bing., 314, 6 Eng. Com.L., 161.) The principle on which the practice essentially rests is, that both the party and the witness are entitled of right to *Page 500 
any explanation which the latter can give of the statements imputed to him. When the witness is present he can be recalled by the same party for the purpose of explanation, after the impeachment has been attempted, but if he happen to be absent then the right is obviously lost. And this is the very reason assigned by the twelve judges, in the Queen's case, why the party proposing to give the declarations in evidence should first, in all cases, interrogate the witness who is alleged to have made them. It becomes very evident, then, that the rule should not be relaxed where a deposition has been taken, and is read at the trial, for the very reason that the personal attendance of the witness cannot be procured. (25 Wend., 259.)
Nor can we, in the present case, admit a distinction founded on the circumstance that the admissions of the witness were made, as alleged, after he had been examined. I cannot perceive that the reasons on which the rule in question is founded lose any of their force in such a case. And not only do those remain unimpaired, but there is an additional one to be found in the temptation held out to tamper with witnesses after their evidence has been given. I can conceive of nothing more dangerous in principle than the doctrine contended for. When a witness has been examined and cross-examined, if we allow him to be approached afterwards and declarations to be drawn from him inconsistent with his testimony, and then receive those in evidence without the protection which the rule affords, there will be no safety in trials. When the first experiment of this kind shall be sanctioned by the courts, there is no doubt that it will be often repeated, and with greater or less success.
The case of The People v. Moore (15 Wend., 419) is not an authority for such a doctrine. In that case, a witness for the prisoner had refused to be cross-examined and was committed for a contempt. After the commitment she admitted in the jail substantially that her evidence was false, and the prosecution was allowed to prove what she *Page 501 
had said. The prisoner was convicted. On motion for a new trial, Chief Justice Savage said, obiter of course, that the ruling on this point was right; but the conviction was set aside on other grounds. The ruling may perhaps have been right, for the particular reason that it would be a useless proceeding to recall the witness, she having refused to testify. There is no other ground on which the dictum can be sustained. But it was not placed on this ground. The remarks of the chief justice were these: "The testimony of the declarations of the witness after her commitment were properly admitted. The rule is, that what a witness has said at another time on the same subject may be shown to impeach him, and when impeached similar testimony may be given to support him. It can make no difference at what time thesedeclarations have been made as to the competency of such testimony, though it may make much as to the effect of it." From this extract it is quite evident that the learned chief justice, instead of attempting to withdraw that case from the general rule on the subject, ignored the rule itself. His attention may not have been called to it. I think it was not then so well understood as it is now.
The only remaining question which has been argued relates to the admissibility in evidence of the defendant's letters, dated the 6th of April and 4th of May, 1853. These were offered, as the case states, to show the estimation in which the defendant held the witness, Adams, and they certainly had no relation to the issue upon trial. The attempt to impeach the credit of that witness by proving his declarations, as we have seen, had been overruled, but his cross-examination was evidently conducted with reference to that object. This rendered it competent for the plaintiffs to sustain him, if they could, by proving any conduct or declarations of the defendant evincing that he held the witness in estimation as an honest and worthy man. The letters in question were written to the witness himself several months after he had been examined in this suit, and *Page 502 
given, as was claimed, a false and perjured account of the transaction. They have some tendency to show that the defendant considered him to be a person worthy of confidence. Indeed, it is difficult to account for the correspondence at all, if we assume that the defendant then regarded the witness and his testimony alike false, as he afterwards found it necessary to insist at the trial. These considerations were entitled to some weight with the jury, and on the whole we think there was no error in allowing the letter to be read.
The judgment should be affirmed.