PEOPLE v. MALLON.

(Supreme Court, Appellate Division, First Department. December 21, 1906.)

1. HOMICIDE—MANSLAUGHTER—EVIDENCE—SUFFICIENCY.

Evidence on a trial for homicide *held* to support a conviction of manslaughter in the first degree.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 26, Homicide, § 541.]

2. WITNESSES—IMPEACHMENT—INCONSISTENT STATEMENT OF WITNESS—LAYING FOUNDATION.

A witness may be impeached by proof of his having made statements contradictory to his testimony, where he has first been interrogated with sufficient particularity of persons, time, and place to call his attention to whether or not he made the contradictory statements, and where he denies making them or asserts that he does not remember.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 50, Witnesses, §§ 1233–1242.]

3. SAME—PROOF OF HOSTILITY.

The hostility of a witness may be shown on his cross-examination, or by witnesses who can testify to the facts showing it, without previous cross-examination of the witness on the subject.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 50, Witnesses, §§ 1192–1199.]

4. SAME.

A witness for the prosecution in a criminal case, who had not been interrogated as to whether, after the commission of the offense, he had stated whether he would tell the truth in reference to the offense, cannot be impeached by the testimony of a witness that he made a statement that he would give false testimony.

5. CRIMINAL LAW—EXCLUSION OF EVIDENCE—REVERSIBLE ERROR.

In a trial for homicide, the killing was admitted and that decedent was shot in the back while fleeing from accused, a police officer, was established. A witness for the prosecution testified that accused shot decedent while the latter was running away. The testimony of the witness showed that he had been convicted of crime and that he did not know anybody in the police department that was a friend of his. Held, that the ruling of the court in sustaining an objection to a question asked a witness for accused as to whether or not the witness for the prosecution had stated whether he would tell the truth in reference to the homicide, if erroneous, was not reversible error, within Code Cr. Proc. § 542, requiring the appellate court to give judgment without regard to technical errors which do not affect the substantial rights of the parties.

6. SAME—INSTRUCTIONS—BURDEN OF PROOF.

Where, on a trial for homicide, the court charged that the burden of proof rested on the prosecution, and if, on the evidence, the jury entertained a reasonable doubt of the guilt of accused, he should be acquitted, and that the burden of proof remained with the prosecution, the refusal to charge that, if accused believed himself to be in danger of bodily harm from decedent, he was justified in the killing, etc., was not erroneous, as placing on the accused the burden of convincing the jury that his testimony was true.

7. HOMICIDE—EVIDENCE—SELF-DEFENSE.

Where, on a trial for homicide, the killing was admitted, and the sole claim of accused was that the killing was accidental and involuntary, the court was not required to submit the issue of self-defense.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 26, Homicide, §§ 614, 622–625.]

8. SAME—INSTRUCTIONS.

A requested instruction, on a trial for homicide, that, if accused believed himself to be in danger of bodily harm from decedent, he was justified in the killing, and one who is without fault, when attacked by another, may kill his assailant, where the circumstances be such as to furnish reasonable grounds for apprehending a design to do him some great bodily harm, was properly refused, because it failed to include the rule that accused was bound to retreat and flee from the threatened danger, if he could, before exercising the right of self-defense.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 26, Homicide, § 630.]

Appeal from Court of General Sessions, New York County.

Arthur J. Mallon was convicted of manslaughter in the first degree, and he appeals. Affirmed.

Argued before McLAUGHLIN, PATTERSON, INGRAHAM, CLARKE, and HOUGHTON, JJ.

John F. McIntyre (Edward Weiss, on the brief), for appellant.
William Travers Jerome, Dist. Atty. (Robert S. Johnstone, of counsel), for the People.

CLARKE, J. The defendant was indicted for the crime of murder in the first degree, for having shot in the back one Robert Brennan, who thereafter died from said wound. The defendant was a policeman, and at the time of the shooting was in plain clothes and not on duty. The evidence offered by the people tended to establish: That on the early morning of Sunday, May 8, 1904, the deceased entered into the saloon, No. 23 Bowery, accompanied by several companions. That after a few minutes the defendant came into the saloon, accompanied by one Jones, his stepbrother, and in a boisterous and profane manner inquired for the proprietor of the establishment. When the defendant came in, somebody said, "I think that that is a copper," and the defendant's companion said, "Boys, he is a copper, but he is a good fellow at that." Several of those present arose to leave, among others one William O'Brien, who went out first. O'Brien testified that he walked down the Bowery a short distance and stood in front of No. 19 Bowery on the sidewalk. While he was standing there several other men came out and passed up the street, and then Jones came out immediately followed by the defendant; that the defendant and Jones walked down the street in a southerly direction as far as No. 17 Bowery and stood there. While they were standing there, several other men came out of the place and going up town disappeared in the distance. Then Brennan came out alone and walked down the Bowery and in a southerly direction, passing O'Brien. When Brennan reached the spot where defendant and Jones were standing, the defendant put out his hand to stop him. Brennan stepped up and looked at the defendant, and a few words were said between them, and then the defendant struck at Brennan, who dodged the blow and struck back, hitting the defendant in the mouth. After this blow, defendant immediately put his hand in his right-hand trousers pocket and drew his revolver. As he was reaching for his pistol, Brennan turned and ran down the Bowery, the defendant starting after him and pointing his pistol at him. Brennan's back was turned towards the defendant and both were running. They had run about the distance between two elevated railroad pillars when the defendant fired. Brennan was then about 10 or 15 feet away from the defendant and was still running with his back turned towards him. Brennan ran a short distance after he was shot, and endeavored to get hold of a lamp post at Division street, but missed it and fell over with his head towards Catherine street. The defendant ran up to where Brennan was lying and stood over him, pointing the pistol at him again as he lay on the ground.

The witness Schultz was standing on the corner of Division street and the Bowery, looking up town, and saw a man running towards him and another man behind him. He saw the man behind shoot, and the man who was shot then ran about 15 or 20 steps and fell. De Loro, another witness for the people, testified that, when he reached the corner of Bowery and Chatham Square, he heard a shot, and the boy passed by the side of him with his hands to his back and fell in the gutter, and as he fell a man who was running after him came up to the prostrate boy and stood holding a pistol over him. Officer Fitzpatrick testified that he was in Division street when he heard a shot which caused him to look towards the Bowery, and that he went to-

wards the Bowery and saw a young man or boy running across the Bowery in a sort of half gait with his hands to his back, and saw him fall near an elevated pillar; that, after he saw the boy running, he saw a man "going across, like after him, with a pistol at a sort of run." Officer Fogarty testified that he saw a group of men engaged in a scuffle opposite about 15 Bowery; that he saw a man strike the defendant in the face, and that after the blow the man who delivered it started to run down the Bowery; that he then started to come back, and got about 5 feet back, when he stopped again, stood motionless about half a minute, and then again started to run down the Bowery towards Division street; that the witness saw Mallon shoot him before he reached Division street; that when he shot Mallon was about 10 feet from the boy; that when witness got to the boy, where he lay on the street, Mallon was just reaching him with the pistol still in his hand; and that he took the pistol from Mallon.

The defendant admits that he shot the deceased, but claims that it was entirely accidental, and that he did not intentionally fire his pistol. He testified in his own behalf that on the morning of May 8th he had gone with Jones to the saloon at No. 23 Bowery; that he entered the hallway, but did not go into the saloon proper, although Jones did; that after a few minutes Jones came out, and they walked together down the Bowery until they had reached about No. 15, when he heard some hurried footsteps behind him, and was just turning, when he saw a hand with a black-jack in it coming for his jaw; that he put up his hands and received a blow on the palm of his hand, which drove it against his nose and mouth and caused them to bleed; that he turned round and faced north, and saw four men running towards him; that the man who had assaulted him passed him and continued south; that he drew his revolver, took off the pouch cover, and held it towards the four men, one of whom had a bottle in his hand, and another he was sure held a knife; that as he held up the revolver they checked; that he heard his stepbrother cry, "Look out for the man behind you;" that he turned and saw Brennan coming towards him with the black-jack; that he pointed his revolver at him; that as soon as Brennan saw the revolver he immediately turned and ran south again; that he cried to him "Halt!" and started to run after him; that as soon as he did so one of the men jumped in and grabbed him by the arm; that other men were closing in around him; that he wrenched himself free, and in doing so his finger on the trigger contracted and the gun exploded; that as soon as the revolver exploded the man who had hold of him let go; that he continued to run after Brennan until he fell at the intersection of Division street and the Bowery, and he almost fell over him. He testified that Brennan started to run south; that he started to run after him; that he pointed his revolver at him, pointed it over his head while he was running after him; and that it was his action in endeavoring to wrench himself loose from the grasp of the man that caused the revolver to go off. He said:

"I had no intention whatsoever of shooting this man. It was through my instrumentality that he was shot, but it was involuntary on my part."

101 N.Y.S.—52

Without attempting to further set forth the evidence, it is enough to say that a question of fact was presented upon which the jury had the right to find that the defendant, while in citizen's clothes and not on duty as an officer, after an altercation upon the street, in the course of which he had been hit in the face by Brennan, while his assailant was running away from him, had run after him and shot him in the back, and that from the effects of the wound thus administered Brennan died. The verdict of manslaughter in the first degree was entirely justified upon all the evidence in the case.

The appellant urges that there was reversible error in the exclusion of testimony showing the hostility of the witness O'Brien towards the defendant. One Tausig was called by the defendant, and, after testifying to some facts relative to the shooting, stated that he had known William O'Brien for six or seven years, and that he remembered seeing him two nights after the shooting occurred at No. 23 Bowery. Whereupon this question was asked, "Did O'Brien at that time state whether he would tell the truth or tell a lie as to what happened that morning in reference to Mallon?" which question he was not permitted to answer. The appellant now urges that this question was put to the witness for the purpose of proving hostility on the part of the witness O'Brien toward the defendant, and that it was error to exclude it. O'Brien had not been interrogated while on the stand in regard to any such occurrence or conversation. The evidence was offered, of course, for the purpose of impeaching O'Brien.

There are two rules firmly established by the decisions in this state. The first is that evidence may be offered to show that a witness has made statements contradictory to his testimony upon the trial, for the purpose of attacking his credibility. Before such evidence can be introduced, the witness must be first interrogated, with sufficient particularity of person, time, and place to call his attention thereto, as to whether or not he did make such contradictory statements. If he denies such statement, or asserts that he does not remember it, such statement may be proved. If the question under consideration was asked simply as an impeaching question, it was properly excluded. In McCulloch v. Dobson, 133 N. Y. 114, 30 N. E. 641, the whole court concurring, Judge O'Brien said:

"It was sought to impeach one of the witnesses for the defendants, who gave material evidence, by proof of his admissions after the testimony was given to the effect that it was not truthful. This was excluded. A witness cannot be impeached by proof of the declarations made out of court, before or after trial, contradictory of his testimony, until a proper foundation is laid for the impeachment by interrogating the witness himself in regard to this statement."

See, also, Stacy v. Graham, 14 N. Y. 492; Lee v. Chadsey, 3 Abb. Dec. 43.

The second rule is that the hostility of a witness towards a party, against whom he is called, may be proved by any competent evidence. It may be shown by cross-examination of the witness, or witnesses may be called who can swear to facts showing it. It would have been competent, therefore, without previous cross-examination upon the subject, to have proved facts tending to establish hostile relations between

the witness O'Brien and the defendant. The question is whether, under this rule, mere utterances of the witness claimed to show hostility can be proved, without preliminary interrogation as to those utterances of the witness himself. The reason for the rule requiring, in the case of mere contradictory statements, that there should be a preliminary interrogation, is primarily based upon the uncertainty of hearsay evidence; that when one person undertakes to say, after more or less lapse of time, what another person said, the accuracy of the repetition depends upon the correct understanding in the first instance of the statement, its accurate preservation in the memory of the testifying witness, its accurate reproduction upon the trial; together with the circumstances under which it was first uttered and its relation to the rest of the transaction of which it purports to be a part. With these numerous chances for misunderstanding, forgetfulness, and misrepresentation, it has always been thought, in this state at least, that it was due, not only to the convenience of trials and the interest of justice, but also to the rights of the witness, that he should have an opportunity of tendering his version of the matter in the first instance. Therefore preliminary interrogation of a witness as to contradictory utterances has always been required.

There does not seem to me to be any reason why the same rule should not apply to mere utterances claimed to indicate hostility. A careful examination of the cases in this state has failed to discover the establishment of a contrary rule. In People v. Brooks, 131 N. Y. 321, 30 N. E. 189, the general rule is stated as follows:

"The hostility of a witness towards a party against whom he is called may be proved by any competent evidence. It may be shown by cross-examination of the witness, or witnesses may be called who can swear to facts showing it. There can be no reason for holding that the witness must first be examined as to his hostility, and that then, and not till then, witnesses may be called to contradict him, because it is not a case where the party against whom the witness is called is seeking to discredit him by contradicting him. He is simply seeking to discredit him by showing his hostility and malice; and, as that may be proved by any competent evidence, we see no reason for holding that he must first be examined as to his hostility."

In that case the question of utterances was not involved. The questions were addressed to the defendant, a witness in her own behalf, and were direct as to facts, as follows:

"Now state whether or not Charlotte [a previous witness] was friendly to you or unfriendly. Did you and Charlotte have frequent difficulties during that time? Did Charlotte assault you on other occasions previous to the fire?"

And it was in regard to such questions that the court held that no preliminary inquiries of the witness were necessary.

So in Brink v. Stratton, 176 N. Y. 150, 68 N. E. 148, 63 L. R. A. 182, where the rule laid down in the Brooks Case, supra, was reasserted, the questions ruled on and held proper were not as to utterances but as to facts. In Starks v. People, 5 Denio, 106, which was the case of an utterance tending to show hostility, the alleged hostile witness was, upon cross-examination, first interrogated thereon, and such was the case, also, in Newton v. Harris, 6 N. Y. 345.

In Stacy v. Graham, 14 N. Y. 492, the testimony of a witness had been taken de bene esse and was read at the trial. After the plaintiff had rested, the defendant offered to prove conversations with that witness, after the examination, in which he confessed that his evidence was false, that he had given it under threats, that he regretted what he had to swear to, etc. The Court of Appeals sustained the rejection of the testimony and expressly overruled People v. Moore, 15 Wend. 419, saying:

· "The principle upon which the practice essentially rests is that both the party and witness are entitled of right to any explanation which the latter can give of the statements imputed to him."

In Lee v. Chadsey, 3 Abb. Dec. 43, where evidence was rejected that a witness had said that he would swear false in a case of usury, the court said:

"The same foundation must be laid for the reception of evidence of particular declarations or acts of a witness of the nature above stated as in the case of evidence of his contradictory statements, and for the same reason."

In Schultz v. Third Ave. Railroad Co., 89 N. Y. 242, where the rule was again stated as to the competency of evidence showing the hostility of a witness, the witness had been first interrogated in his cross-examination as to his conversation. In Garnsey v. Rhodes, 138 N. Y. 461, 34 N. E. 199, the questions held to have been erroneously ruled out were those addressed in cross-examination to the witness himself for the purpose of showing his own hostility. In People v. Webster, 139 N. Y. 73, 34 N. E. 730, there was a preliminary cross-examination of the witness as to the matters subsequently proved. In Lamb v. Lamb, 146 N. Y. 317, 41 N. E. 26, proof of a quarrel and dispute was admitted between the parties to the action. In Gundy v. Metropolitan Street Railway Co., 65 App. Div. 38, 72 N. Y. Supp. 551, there was a preliminary cross-examination of the alleged hostile witness.

In Mr. Wigmore's valuable treatise on Evidence it is stated as follows:

"Sec. 953. Preliminary Inquiry to Witnesses. On the principle of fairness and of the avoidance of surprise, the settled rule obtains, in offering evidence of prior self-contradictory statements, that the witness must first be asked, while on the stand, whether he made the statements which it is intended to prove against him. Does the same rule apply to the use of evidence of former utterances of the witness indicating bias? Must the witness first be asked whether he made them? He must, as a matter of principle; for the same reasons of fairness that require a witness to be given an opportunity of denying or explaining away a supposed self-contradictory utterance require him also to have a similar opportunity to deny or explain away a supposed utterance indicating bias."

He states that in England the preliminary inquiry is necessary, and cites Carpenter v. Wall, 11 A. & E. 804, where Patterson, J., said:

"I like the broad rule that, where you mean to give evidence of a witness' declarations for any purpose, you should ask him whether he ever used such expressions."

He also cites cases from 14 states holding the preliminary inquiry necessary, and from 5 states that it is unnecessary. Massachusetts is one of the states in which such inquiry is unnecessary; but in that state

contradictory statements may also be shown without preliminary inquiry, as shown in Day v. Stickney, 14 Allen (Mass.) 255:

"Under our practice a declaration, made out of court, contrary to or inconsistent with the testimony of a witness in any material matter, may be proved by other testimony, either with or without a previous inquiry to the witness thus contradicted."

This rule, of course, is opposed to that which prevails in this state. It would therefore seem that in the few states in which the utterances are provable without preliminary interrogation the courts are governed by their similar rule in regard to contradictory statements. While showing the weight of authorities as above, Mr. Wigmore concludes:

"The rule in any case applies only to utterances not to conduct or circumstance such as an assault or employment."

The same general rule is found in American and English Enc. of Law (2d Ed.) vol. 30, p. 1137:

"Bias of Witness. In some states evidence showing that a witness is interested in the result of the litigation or otherwise biased in favor of or against one of the parties is admissible without first examining the witness on the subject. The weight of authority is to the contrary, however, at least where the bias is sought to be shown by the declarations of the witness himself."

It seems to me, therefore, that the evidence was properly excluded. But, if not, the error was not sufficient to require reversal, under the rule laid down in People v. Brooks, supra, where, although the court held that the evidence ought to have been admitted, it said, nevertheless, that "we think there was ample evidence to show the state of feeling between the defendant and Charlotte, and if the examination of the defendant upon that subject had been much further prolonged it could not have added any weight to the evidence already given on that subject," and declined to reverse.

In this case, it appeared from the witness O'Brien's testimony that he had many times been convicted of crime and that he had spent a very considerable time in the penitentiary and in state's prison, and was asked by defendant's counsel:

"You are not friendly with the police department, are you, O'Brien?"

To which he answered:

"I don't know of anybody in the police department that was a friend of mine, since I never went to their houses or dined with them, and never went to any of their weddings, or parties, or balls.

"In other words, it is best for you to keep out of their way?

"No, it isn't; not at all. If it was my place to look out for them, I would not be here today."

It seems to me that the facts proved, there being no evidence whatever of any previous acquaintance or dealings with defendant, were enough to require of the jury the most careful weighing of this witness' testimony, and, even if the question had been allowed, it would not have added to the duty of the jury in that regard. The fact of the killing was admitted, and that a fleeing man was shot in the back was established beyond the possibility of a doubt. O'Brien's evidence was so corroborated in all essential details that we are required by section 542 of the Code of Criminal Procedure to disregard this error, even if it be one. I do not think it was.

The appellant further contends that there was error in the charge of the learned court. At the conclusion of the main charge his counsel requested the court to charge as follows:

"That if the jury should find that the defendant was in no danger of bodily harm from the deceased, but that the defendant believed himself to be in danger, although no danger may have existed, the defendant was justified in shooting the deceased.

"The Court: I decline to charge in the language requested, for the reason I have already stated to the jury that the defendant has stated that he did not intentionally shoot the deceased, but that the shooting was accidental; and if the jury accept that he is entitled to an acquittal.

"Defendant's Counsel: I ask your honor to charge the jury as follows: That one who is without fault himself, when attacked by another, may kill his assailant, if the circumstances be such as to furnish reasonable grounds for apprehending a design to take away his life or to do him some great bodily harm, and there is also reasonable ground for believing the danger imminent that such design will be accomplished, although it may turn out afterwards that the appearances were false and that there was in fact no such design or any danger that it would be accomplished.

"The Court: I decline to charge in the language requested, for the reason, previously stated, that it is not applicable to this case."

The appellant urges that the refusal to charge these requests in effect put upon the defendant the burden of convincing the jury that he was telling the truth, whereas it was the required duty of the prosecution to establish his guilt beyond a reasonable doubt. This claim does not seem to be well founded; for, in addition to the instruction as to burden of proof and reasonable doubt in the main charge, the court, at the defendant's request, charged as follows:

"That the burden of proof rests upon the prosecution, and if, on the whole evidence, including that of the defense as well as that of the prosecution, the jury entertain a reasonable doubt of the guilt of the accused, he is entitled to the benefit of that doubt, and must be acquitted."

And also:

"When the prosecution has made out a prima facie case, the burden of proof is not on the defense to satisfy the jury of the defendant's innocence, but the burden of proof is all the time on the prosecution."

The jury could have had no doubt as to the obligation resting upon the people.

In the case at bar no defense of self-defense was interposed by the defendant, but his sole claim was that the shooting was entirely accidental and an entirely involuntary act on his part. There is no evidence in the record which would justify the submission of the question of self-defense to the jury. The court is not required to instruct the jury in matters not pertinent to the record, nor to answer abstract questions. Moreover, the requests to charge were defective, in that they did not include the rule that the defendant was bound to retreat and flee from the threatened danger, if he could. People v. Johnson, 139 N. Y. 363, 34 N. E. 922. "Before one can justify the taking of life in self-defense, he must show that there was reasonable ground for believing that he was in great peril, and that the killing was necessary for the escape from the peril, and that no other safe means of escape was open to him."

We have carefully examined the whole record, and considered each of the questions raised, and have reached the conclusion that the de-

fendant had a fair trial, that no errors were committed to his prejudice, and that upon the evidence the conviction was proper, and the judgment should be affirmed.

INGRAHAM, McLAUGHLIN, and HOUGHTON, JJ., concur.

PATTERSON, J.   I concur in the affirmance of this judgment. If it was error to exclude testimony as to hostility of the witness O'Brien towards the defendant, it is evident from the whole record that such error was harmless.