

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-21-00112-CR

_____

TAYTON SETH FINLEY, Appellant

V.

THE STATE OF TEXAS

On Appeal from County Criminal Court No. 5
Tarrant County, Texas
Trial Court No. 1607688

Before Kerr, Bassel, Walker, JJ.
Opinion on Rehearing by Justice Walker

**OPINION ON REHEARING**

After reviewing the State's motion for rehearing, we grant the motion, withdraw our September 22, 2022 opinion and judgment, and substitute the following in their place.

Appellant Tayton Seth Finley appeals from his conviction for misdemeanor assault causing bodily injury to his ex-girlfriend, T.G.[1] Finley argues that the trial court denied him his Sixth Amendment Right to Confrontation by allowing T.G. to testify at trial while wearing a mask. We will reverse the trial court's judgment and remand the case for a new trial because the trial court erred in allowing T.G. to testify behind a mask without sufficient findings related to T.G.'s particular need to wear a mask, and because such error was harmful.

## I. BACKGROUND

### A. TRIAL PROCEEDINGS

### 1. T.G. Testifies While Wearing a Mask

Finley's jury trial took place in late July 2021. Masks were voluntary for anyone in the courtroom, including witnesses. T.G.—the sole complainant and eyewitness to the alleged assault—took the witness stand while wearing a surgical mask that covered her nose and mouth. Finley's counsel requested that the trial court require T.G. to remove her mask while she testified, citing Finley's Sixth Amendment right to face-to-

_____

[1]In their appellate briefs, both parties refer to the complaining witness by her initials, T.G. We will follow their lead.

face confrontation. Specifically, he worried that the mask would interfere with the jury's ability to evaluate T.G.'s facial expressions and demeanor.

The State countered that Finley's request was nothing more than an attempt to "harass and annoy the victim" and pointed to the "situation in the world" as the basis for allowing T.G. to keep her mask on. The State proffered that the issue boiled down to one of T.G.'s comfort amidst the COVID-19 pandemic:

> [I]f [T.G.] feels most comfortable testifying with a mask on in a room with many[,] many people in it and . . . she doesn't know their background or whether or not they are coughing. I believe it is entirely within her right and it does not affect Crawford or the 6th Amendment right to confront witnesses. I believe actually the Supreme Court orders from Texas have been very clear [that] we should do as much as possible to protect people during in-person proceedings. So for that reason, if she wants to wear a mask, I'd ask that she be allowed to wear a mask.

Finley's attorney responded that, in his estimation, proper social distancing accommodations had been made in the courtroom in accordance with then-current CDC guidelines and Texas Supreme Court COVID-19 emergency orders.[2] He did, however, concede that he might need to approach T.G. while she testified "to show her some documents."

---

[2]At the time of Finley's trial, the supreme court's thirty-eighth emergency order was in effect. *See Thirty-Eighth Emergency Order Regarding COVID-19 State of Disaster*, 629 S.W.3d 900, 900 (Tex. 2021). This order required that, "subject only to constitutional limitations," courts should take all "reasonable action to avoid exposing court proceedings and participants to the threat of COVID-19." *Id.* Further, a trial court was permitted to conduct jury proceedings if the local administrative judge had adopted "minimum standard health protocols for court proceedings" to include "masking, social distancing, or both." *Id.* at 901.

The trial court denied Appellant's request, citing the emergency orders:

> But I think that [the State] is correct. The overall tenure of these orders has been that we do whatever we can to protect each other, the community, from the Covid virus. So if [T.G.] wants to wear a mask, I'm not going to tell her she can't.

## 2. T.G.'s Testimony

T.G. testified that, after a night out drinking, she and Finley had gotten into an argument on their drive to his house. The argument escalated when they arrived at the house and Finley purposefully crashed his vehicle into a fence outside his house. He then pulled T.G. out of the car by her hair, and he beat her with his fists. According to T.G., Finley then dragged her into the house and continued to beat her with his fists which caused her to lose consciousness. After two days of persistent pain and swelling from the assault, T.G. went to the hospital. She initially reported that she sustained her injuries after falling from a horse. But after examining her injuries, hospital staff asked the police to come to the hospital to speak with T.G. Though reluctant, T.G. eventually explained to police that she had been assaulted by Finley.

## 3. Additional State's Evidence

A nurse testified that she had helped treat T.G. at the hospital. Her testimony consisted mainly of reading from T.G.'s medical records because, at the time of trial nearly two years after the incident, the nurse did not specifically remember treating T.G. The medical records showed that T.G. had indicated to the nursing staff that

4

her injuries were caused by Finley beating her. These injuries included deep bruises to her chest and shoulder.

The State also called multiple police officers who had interviewed T.G. about the assault allegations. One of the officers who spoke with T.G. at the hospital noticed bruising on her arm and described her as "anxious" and "concerned." Another officer who spoke with T.G. on the phone testified that he had viewed photographs of T.G. after the alleged assault and that her injuries appeared consistent with those obtained during an assault. He also viewed photographs of the driveway where Finley reportedly crashed his vehicle and testified that "the ground appeared to be chewed up" and that part of the fence was missing its panels.

Finally, a victim assistance specialist for the police department testified as an expert about the various cycles of domestic violence. She testified that she did not know any details about Finley's case but that it was common for victims of domestic violence to be fearful of talking to law enforcement or of prosecuting an assault allegation. She also testified that it was common for victims to have trouble remembering certain details of a traumatic event.

### 4. The Verdict

During deliberations, the jury informed the trial court that it could not reach a unanimous decision. However, after receiving an *Allen* charge from the trial court, the jury returned a guilty verdict. *See Allen v. United States*, 164 U.S. 492, 501, 17 S. Ct.

154, 157 (1896). Finley was sentenced to 300 days in jail and fined $4,000. This appeal followed.

## B. APPEAL ABATED FOR PARTICULARIZED FINDINGS

### 1. Abatement Order

Beyond the non-evidentiary arguments of the parties, no evidence was offered at trial to explain T.G.'s need to wear a mask, and the trial court failed to announce on the record or file any findings related to T.G.'s particular need to wear a mask. Accordingly, and on our own motion, we abated this appeal on July 15, 2022, and ordered that the trial court supply us with "case-specific, evidence-based findings pertaining to whether it was necessary for T.G. particularly to wear a mask while she testified." *See Maryland v. Craig*, 497 U.S. 836, 855, 110 S. Ct. 3157, 3169 (1990) (holding that the trial court must hear evidence and make case-specific findings that use of special courtroom procedure that permitted a child to testify in the absence of face-to-face confrontation of defendant was necessary "to protect the welfare of the particular child witness"); *Haggard v. State*, 612 S.W.3d 318, 325–28 (Tex. Crim. App. 2020) (applying *Craig* necessity-findings rule in Texas case involving an adult witness); *see also Romero v. State*, 136 S.W.3d 680, 684–85 (Tex. App.—Texarkana 2004) *aff'd*, 173 S.W.3d 502 (Tex. Crim. App. 2005) (same). We further ordered the trial court to "notify this court if the trial court require[ed] more than forty-five days to make and file these findings."

6

## 2. First Supplemental Record

On August 19, 2022, the trial court submitted its first supplemental clerk's record that did not include any particularized findings but merely supplemented the clerk's record with three documents devoid of any explanation: (1) a COVID-19 operating plan for the Tarrant County judiciary implemented by the local administrative judge, (2) an order of assignment showing that Finley's case had been assigned for all purposes to a retired judge, and (3) a case docketing sheet.[3]

The operating plan, which went into effect on June 7, 2021, permitted in-person proceedings but required judges to take "reasonable steps to protect judges and court staff from contracting COVID-19." People who had been exposed to or were showing symptoms of COVID-19 were prohibited from entering court facilities. Further, courts were ordered to establish policies and procedures to minimize the likelihood that court participants would violate social-distancing rules. The plan did not address the wearing of masks.

## 3. Abatement Hearing Record and Findings

On September 22, 2022[4]—the same day that we issued our original opinion—the trial court supplemented the appellate record with a transcript of a non-

---

[3]The docketing sheet, which already existed in the original clerk's record before this court, recited basic information about Finley's case such as plea, verdict, and punishment details.

[4]We were given no explanation for the record being supplemented more than three weeks beyond the forty-five-day deadline provided in our abatement order.

evidentiary[5] abatement hearing that had been held on August 17, 2022. This transcript includes thirty-six findings of fact orally pronounced by the trial court that were subsequently reduced to writing and filed with this court on September 29, 2022. Though lengthy, for context we will recite each written finding in its entirety:

1. This trial was held during a time of disaster declarations, declarations of public health disaster, and emergency orders issued by various governmental entities in response to a deadly global pandemic caused by a contagious virus.

2. This is not a case where face-to-face confrontation was denied. The witness was physically present in court along with all the other participants in the trial: [Finley], 1 defense counsel, 2 prosecutors, 2 bailiffs, 1 court reporter, 6 jurors, and 1 judge. The witness testified in open court in a public courtroom in the presence of [Finley] and his counsel. The witness did not testify via closed circuit television, Zoom or other electronic means, nor was the witness behind a screen or other similar barrier preventing [Finley] and his counsel, or other trial participants, including the jury, from physically viewing and observing the witness during her testimony.

3. The witness did not wear any type of disguise during her testimony. She did not have on sunglasses or a hat of any kind. She wore a surgical-type mask.

---

[5]The reporter's record of the abatement hearing shows that no witnesses were called but contains two exhibits. State's Exhibit 1 is a copy of the supreme court's fortieth Covid-19 emergency order. *See Fortieth Emergency Order Regarding COVID-19 State of Disaster*, 629 S.W.3d 911, 911 (Tex. 2021) (effective August 1, 2021). The second exhibit—marked as "Court's Exhibit 1"—is a document titled "Current and Emerging Health Issues" created by the Tarrant County Public Health department (TCPH). Under the heading "COVID Surge!," a number of statistics purportedly show a rising trend of COVID-19 cases, deaths, and hospitalizations in Tarrant County as of July 19, 2021. The trial court, sua sponte, judicially noticed this document for record purposes and noted that the document was copied from a TCPH presentation made to the Tarrant County Commissioner's Court on the day before Finley's trial commenced.

4.  There is no issue in this case regarding the identity of the witness. She was known to [Finley]. She had lived with [Finley] and had a child with [Finley].

5.  If the *Craig* requirements apply, the court finds there was an important public policy of protecting the participants in the trial, as well as the public, for the following reasons:

a. at the time of the trial there was a deadly global pandemic caused by a contagious virus; and

b. most, if not all, of the Emergency Orders of the Supreme Court of Texas, the Office of Court Administration's various Guidance and Best Practices documents, the various Declarations of Disaster and the Executive Orders from the Governor of the State of Texas, the various Declarations of Local Disaster due to Public Health Emergency issued by the Tarrant County Judge and County Commissioners, the Tarrant County Health and Safety Policy established by the Tarrant County Commissioners Court, and the Local Operating Plans established by the Tarrant County judiciary (to all of which the court takes judicial notice) dealt with matters of safety for court participants and the public during said pandemic.

6.  The court takes judicial notice of, and finds, the courtroom in which this trial was held was at all times open to the public during the trial.

7.  The court takes judicial notice of, and finds, the witness entered the courtroom wearing a surgical-type mask.

8.  The court made a reasonable deduction from the fact the witness was wearing a surgical-type mask that she wanted to continue wearing the mask.

9.  The court takes judicial notice of, and finds, that while the witness was in the courtroom and testifying before the jury, there were at all times at least[] 14 other people present ([Finley] and his counsel, 2 prosecutors, 2 bailiffs, 1 court reporter, 6 jurors, and 1 judge).

10.  The court makes a reasonable deduction from the facts and circumstances of this trial and so finds that the witness could not have

known what precautions, if any at all, other than possibly wearing a surgical-type mask, any of the other persons in the courtroom had taken to avoid exposure to and spreading of the Covid-19 virus.

11. The court makes a reasonable deduction from the facts and circumstances of this trial and so finds that none of afore-mentioned participants in the trial could have known what precautions, if any at all, other than wearing a surgical-type mask at the time, the witness had taken to avoid exposure to and spreading of the Covid-19 virus.

12. The court finds the witness was employed in a health-care facility and makes a reasonable deduction from that fact that the witness had more specialized knowledge of the importance of and the need to wear a surgical-type mask to avoid exposure to and spreading of the Covid-19 virus.

13. The court finds the witness never indicated a desire to remove her surgical-type mask before or during her testimony.

14. The court finds the objection to the witness wearing a surgical-type mask was made immediately after the witness was called to the witness stand and before she began her direct examination testimony.

15. The court finds [Finley] and his counsel were given the opportunity to move closer to the witness while she was testifying but apparently chose not to do so because they did not do so.

16. The court finds that defense counsel did not request the witness wear a face shield instead of the surgical-type mask.

17. The court finds that at no time was any offer of proof made, or requested to be made, of any particularized reason to require the witness to remove the surgical-type mask, which [Finley] would know since he and the witness lived together for some time and have a child together.

18. The court finds the witness was under oath while testifying.

19. The court finds during the witness' testimony, she was visible to [Finley], his counsel, the prosecutors, the jury, and the court.

20. The court finds [Finley], prior to beginning cross-examination of the witness, did not renew or re-urge his objection to the witness testifying during cross-examination while wearing a surgical-type mask, cross-examination being the time when the witness was literally being confronted on behalf of [Finley].

21. The court finds the witness was subjected to contemporaneous, rigorous, thorough, and effective cross-examination by defense counsel in the presence of [Finley], prosecutors, the jury, and the court.

22. The court finds the direct examination of the witness in the presence of [Finley], defense counsel, prosecutors, jury, and the court lasted approximately 59 minutes (time outside presence of the jury has been omitted).

23. The court finds the cross-examination of the witness in the presence of [Finley], defense counsel, prosecutors, jury, and the court lasted approximately 135 minutes (time outside presence of the jury has been omitted).

24. The court finds the witness was approached by defense counsel during cross-examination at least 6 times in the presence of the jury.

25. The court finds [Finley], through defense counsel, was given full and ample opportunity to cross-examine the witness, and did so.

26. The court finds [Finley], through defense counsel, was given full and ample opportunity to confront the witness face-to-face and to look her in the eye, and did so.

27. The court, considering the totality of the circumstances, finds that the witness wearing a surgical-type mask while testifying did not impede [Finley]'s right to confront the witness against him in such a manner to make the process unfair to [Finley].

28. The court, considering the totality of the circumstances, finds [Finley]'s right to confront the witness against him was not constitutionally infringed.

29. The court finds that allowing the witness to wear a surgical-type mask while testifying was a reasonable method of ensuring the important

public policy of protecting the participants in the trial and the public during a time of disaster declarations, declarations of public health disaster, and emergency orders issued by various governmental entities in response to the deadly global pandemic caused by a contagious virus.

30. The court finds that allowing the witness to wear a surgical-type mask while testifying was at most a minimal, if any, imposition on [Finley]'s right to confront the witness while ensuring the important public policy of protecting the participants in the trial and the public during a time of disaster declarations, declarations of public health disaster, and emergency orders issued by various governmental entities in response to the deadly global pandemic caused by a contagious virus.

31. The court finds that any imposition on [Finley]'s right to confront the witness was tailored to address the circumstances in existence at the time of the trial, to wit: a time of disaster declarations, declarations of public health disaster, and emergency orders issued by various governmental entities in response to the deadly global pandemic caused by a contagious virus, and ensured the important public policy of protecting the participants in the trial and the public.

32. The court finds the witness meets the definition of "victim" as set forth in Article 56A.001 (7), Texas Code of Criminal Procedure.

33. The court finds the witness has the right to be treated with fairness pursuant to Article 1, Section 30(a) of the Constitution of the State of Texas.

34. The court finds that, given the totality of the circumstances, allowing the witness to wear a surgical-type mask as she desired while testifying in a public trial during a time of disaster declarations, declarations of public health disaster, and emergency orders issued in response to the deadly global pandemic caused by a contagious virus, was treating her with fairness as required by Article 1, Section 30(a) of the Con[]stitution of the State of Texas while balancing [Finley]'s right to confront the witness against him, with little or no restriction and no harm to [Finley]. The court finds both [Finley] and the witness were afforded the ability to, and did, exercise constitutional rights guaranteed to them.

. . . .

12

[35.] I'll take Judicial notice that at the time of this trial the Delta variant of the Covid 19 virus was dominant. And when I say protecting the public and the participants of the trial from the virus, I mean that allowing her to wear the mask since she wanted to do that was specifically necessary to do that; and

[36.] In July of 2021 I think everyone knew, including me, that the virus was spreading, that this was a public health situation, that we were inundated with—from news media, governmental agencies, CDC, basically anybody who had an opinion on it was telling us what we should do and what we shouldn't do, so, yeah, of course, the Court was aware of the situation at the time. And all that informs the decision of the Court of she wants to wear a mask, and when all this is going on I didn't see a reason to require her not to.

## II. ANALYSIS

The Confrontation Clause is an important facet of the United States Constitution. It is imperative that defendants have the opportunity to confront their accusers face-to-face. When that accuser is masked while testifying at a jury trial against the defendant, the Confrontation Clause is implicated because the jury is denied the opportunity to read the accuser's face and fully judge their credibility. This is particularly true when the accuser is the sole eyewitness to the alleged crime. There is good reason, after all, why we have expressions in American parlance such as "bald-faced lie," or the older expression of "bare-faced truth"—because much can be gleaned about a person's countenance and truthfulness from their unobstructed facial expressions.

In a single issue, Finley argues that his Sixth Amendment right to face-to-face confrontation was violated when T.G. was permitted to testify while wearing a mask

13

that covered her nose and mouth. Among several sub-issues, Finley posits that reversal is required because the trial court made no case-specific findings as to why it was necessary for T.G., in particular, to wear a mask at trial.

The State responds that Finley's confrontation right was not violated because the trial court's decision to allow T.G. to wear a mask furthered an important public policy—"ensuring the safety of everyone in the courtroom during a global pandemic"—and because the reliability of T.G.'s testimony was not impaired by doing so. On the issue of particularized findings, the State argues that particularized findings are not required in the COVID-19 context.[6] In any event, says the State, the trial court's pronouncement at trial that courts shall "do whatever we can to protect each other, the community, from the Covid virus" and its supplemented thirty-six findings satisfied any such need for particularized findings.

## A. PARTICULARIZED FINDINGS

### 1. Applicable Law

The Sixth Amendment protects an accused's right to confront, face-to-face, any witnesses that testifies against him. U.S. CONST. amend. VI; *Coy v. Iowa*, 487 U.S. 1012, 1017, 108 S. Ct. 2798, 2801 (1988); *Haggard v. State*, 612 S.W.3d 318, 324 (Tex. Crim. App. 2020). The primary aim of this confrontation right is to not only test a

---

[6]Notably, the attorney for the State conceded outright at oral argument before this court that the trial court had not, in fact, made any such findings particular to T.G.

14

witness's memory and conscience but to compel him "to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner which he gives his testimony whether he is worthy of belief." *Mattox v. United States*, 156 U.S. 237, 242–43, 15 S. Ct. 337, 339 (1895). A jury's ability to view a witness's facial expressions is paramount to the confrontation right because the face is "the most expressive part of the body and something that is traditionally regarded as one of the most important factors in assessing credibility." *Romero*, 173 S.W.3d at 505–06 (stating that allowing a witness to testify while disguising his face would "remove the 'face' from 'face-to-face confrontation'").

However, "[a]lthough face-to-face confrontation forms the core of the values furthered by the Confrontation Clause, [the Supreme Court] has nevertheless recognized that it is not the *sine qua non* of the confrontation right." *Craig*, 497 U.S. at 847, 110 S. Ct. at 3165 (internal citations and quotations omitted). Instead, a defendant's confrontation right may be satisfied absent a physical, face-to-face confrontation "only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." *Id.* at 850. To show such necessity, the trial court must hear evidence and then make a case-specific, evidence-based finding that the departure from the face-to-face confrontation right is necessary to protect the well-being of the particular witness. *Id.*; *see Haggard*, 612 S.W.3d at 324–26; *Romero*, 136 S.W.3d at 690–91. However, the trial court commits constitutional error when it dispenses with the

15

accused's confrontation right based on an *insufficient* finding of necessity.  *See Haggard*, 612 S.W.3d at 327–28.

## 2.  The Trial Court's Findings Were Insufficient as to T.G. Particularly

The trial court's findings can be broadly grouped into four categories: (1) general pronouncements about the COVID-19 pandemic and the court's duty to protect the trial proceedings and participants from infection; (2) facts related to the trial court's management of the courtroom and trial proceedings; (3) conclusions of law related to whether Finley's Confrontation right was improperly infringed upon; and (4) findings related to T.G.'s testimony.

Understandably, the State and the trial court repeatedly raise the same refrain, "But, COVID-19."  We acknowledge the multitude of difficult decisions thrust upon trial courts in the face of the pandemic and appreciate this trial court's considerable efforts to protect its courtroom and trial participants from the deadly virus. Nevertheless, neither a generalized pronouncement by the trial court that courts were to protect against COVID-19 exposure nor the existence of governing, state- and county-level COVID-19 disaster orders met this case-specific burden.  *See Romero*, 136 S.W.3d at 690–91 ("Satisfaction of this general standard requires more than a mere showing that public policy would be served; instead, it demands that trial courts make case-specific findings of necessity, justifying the infringement of a defendant's right to confront his or her accusers face to face.")

16

Here, it is the fourth category of findings on which we must focus. Simply put, T.G. should not have been permitted to testify while wearing a mask unless the trial court could articulate, from the evidence before it, a justifiable reason why she specifically, in this particular trial, needed to wear a mask in a courtroom where masks were not otherwise required. There are two sets of findings ostensibly aimed at showing this necessity.

First, after outlining that the courtroom contained at least fourteen people from whom T.G. could not ascertain whether they had taken proper precautions against the virus, the trial court found that T.G. "was employed in a health-care facility." From this, the court deduced that T.G. had a "more specialized knowledge of the importance of and the need to wear a surgical-type mask" to avoid viral exposure and spread. But the plain finding that T.G. worked at a healthcare facility was not sufficient to show her specific need to wear a mask. While it is true that T.G. testified that she worked at a nursing home, this fact came into evidence for purposes not relevant here and was never argued as a basis for T.G.'s need to wear a mask. Rather, there was no evidence that established her actual duties at the nursing home, that she did have "specialized knowledge" as to the necessity of wearing a mask, or, for example, that she was susceptible to spreading the virus to a high-risk population. And even if the evidence supported that T.G. had a "specialized knowledge" about pandemic mask-wearing in a general sense, that fact would say nothing about her own need to wear a mask in this particular trial. *See Craig*, 497 U.S. at 855–56, 110 S. Ct. at

17

3168–69 (explaining that, even though it is generally known that the State has a "transcendent interest in protecting the welfare of children" to allow certain child victims to testify in the absence of face-to-face confrontation, trial courts must still make sufficient evidence-based findings that such is needed to protect the welfare of each particular child witness) (internal quotations omitted).

Second, citing T.G.'s status as a crime victim entitled to be treated with fairness under the Texas constitution, the trial court found that allowing T.G. to testify while wearing a mask during the pandemic "was treating her with fairness as required by Article 1, Section 30(a) . . . ." *See* Tex. Const. art. I, § 30(a)(1). While we are sympathetic to T.G.'s rights as the purported victim in this case, it remains that this finding does not provide an evidence-based explanation for *why* T.G. specifically needed to wear a mask under these circumstances. At best, this finding establishes only the trial court's general belief that fairness permitted T.G.—or presumably any victim under these circumstances—to do so.

On the other hand, because the trial court did not mandate face coverings during Finley's trial, it apparently believed that all participants were adequately protected in the courtroom without needing to wear masks. We are given no explanation as to why T.G. herself needed the protection of a mask when others did not. At no point in these proceedings—not at any pretrial hearing, at trial, on appeal, or upon abatement of the appeal—has any evidence been adduced to explain why T.G. needed this special protection.

18

The State argues that this is not an issue of concern because the trial court was imbued with the authority to allow masked testimony by Texas Supreme Court COVID-19 emergency orders that ordered trial courts to take all reasonable action to protect participants from the virus. *See, e.g., Thirty-Eighth Emergency Order Regarding COVID-19 State of Disaster*, 629 S.W.3d 900 (Tex. 2021).

We are not persuaded by this argument for two reasons. Chiefly, the reasonable-action mandate from those orders was specifically made "subject only to constitutional limitations." *See, e.g., id.* at 900. In other words, trial courts were ordered to take protective steps against COVID-19 only if those steps did not infringe upon a defendant's constitutional rights—such as his Sixth Amendment right to confrontation. *See id.* Additionally, the order effective in July 2021 at the time of Finley's trial did not contain a face-covering mandate, which shows an evolution away from the stricter directives of previous orders that *did* require face coverings in the courtroom. *Compare id.* (containing no face-covering requirement) *with Thirty-Sixth Emergency Order Regarding COVID-19 State of Disaster*, 629 S.W.3d 897, 898 (Tex. 2021) (requiring face coverings to be worn over the nose and mouth).

Finally, the State argues that particular findings as to the individually-masked witnesses are not required in the COVID-19 context given the important public-policy need for courts to protect their participants from the disease. The State points

19

us to several non-Texas cases to support this contention.[7]  We are not swayed by these cases largely because they either ignore or outright abandon—without precedent—the clear directive from *Craig* that courts make such findings.  Instead, the State invites us to follow suit and to fashion a COVID-19-pandemic exception which would alleviate the need for the trial court to enter the requisite findings.  We decline the invitation.

We have found no pandemic-era Texas cases applying the *Craig* factors to a masked-witness situation.  However, one of our sister courts was recently asked to determine whether a defendant's confrontation right was violated when two witnesses were permitted to testify at trial via two-way Zoom teleconferencing technology.  *See Dies v. State*, No. 05-20-00951-CR, 2022 WL 3097816, at *6 (Tex. App.—Dallas Aug. 4, 2022, no pet. h.).  In *Dies*, the trial court heard evidence that one witness had just tested positive for COVID-19 and that the other was 38 weeks pregnant, lived two hours away, and had been advised by her doctor not to travel.  *Id.* at *1–2.  The trial court found that these conditions warranted allowing the witnesses to testify remotely.  *Id.* at *4.  The Fifth Court of Appeals held—after explaining that Texas courts indeed must make evidentiary, case-specific findings before dispensing with the face-to-face right—that the *Craig* factors had been satisfied by the trial court.  *Id.* at *6.

---

[7] *See United States v. James*, No. CR-19-08019-001PCT-DLR, 2020 WL 6081501, at *1 (D. Ariz. Oct. 14, 2020); *United States v. Crittendon*, No. 4:20-CR-7 (CDL), 2020 WL 4917733 (M.D. Ga. Aug. 21, 2020), at *6; *State v. Modtland*, 970 N.W.2d 711, 720 (Minn. Ct. App. 2022).

We will follow the *Dies* court's lead in declining to abandon the *Craig* particularized-findings requirement in the pandemic context. Accordingly, we hold that the trial court erred when it allowed T.G. to testify while wearing a mask in the absence of a sufficient particularized finding as to her particular need to do so.

## B. HARM ANALYSIS

Having held that the trial court erred, we must determine whether such error was harmful. *See Haggard*, 612 S.W.3d at 328.

### 1. Applicable Law

A denial of physical, face-to-face confrontation is reviewed for harmless error. *Coy*, 487 U.S. at 1021, 108 S. Ct. 2798; *see Chapman v. California*, 386 U.S. 18, 23, 87 S. Ct. 824, 17 (1967). Constitutional error is harmful unless a reviewing court determines beyond a reasonable doubt that the error did not contribute to the conviction. Tex. R. App. P. 44.2(a). The State has the burden to prove that the error is harmless beyond a reasonable doubt. *Haggard*, 612 S.W.3d at 328. That is, if we are unable to conclude beyond a reasonable doubt that the error did not contribute to the conviction, we must reverse and order a new trial. *Langham v. State*, 305 S.W.3d 568, 582 (Tex. Crim. App. 2010).

In the context of the denial of face-to-face confrontation, the harm analysis "cannot include consideration of whether the witness' testimony would have been unchanged, or the jury's assessment unaltered, had there been confrontation" because "such an inquiry would obviously involve pure speculation." *Coy*, 487 U.S. at 1021–

21

22, 108 S. Ct. at 2803. Instead, harm must be determined based on "the remaining evidence." *Id.* While our determination should consider "any circumstance apparent in the record that logically informs the harm issue," a number of factors can aid our analysis: (1) importance of the witnesses' testimony to the prosecution's case, (2) whether the testimony was cumulative, (3) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, (4) the extent of cross-examination otherwise permitted, and (5) the overall strength of the prosecution's case. *Haggard*, 612 S.W. at 329.

## 2. Error Not Harmless Beyond a Reasonable Doubt

Arguing that any error was harmless here, the State focuses on factors three, four, and five. According to the State, many of the details testified to by T.G. were corroborated by other evidence at trial, such as medical records and police interviews. Further, the State argues that the extent and duration of T.G.'s cross-examination—which spanned nearly three hours—bears in favor of the error being harmless. Finally, the State contends that its case was strong because T.G.'s testimony itself was strong.

We see it differently than the State. Having found error in allowing T.G. to testify while wearing a mask, we must set aside her testimony and analyze harm based on the remaining State's evidence. *See Haggard*, 612 S.W.3d at 628. Materially, that evidence consisted of:

22

1. the nurse's testimony, derived mainly from medical records, concerning T.G.'s injuries;

2. testimony from multiple police officers describing T.G. as "anxious" and "concerned" two days after the alleged assault, characterizing her injuries as consistent with an assault, and indicating that pictures showed that the ground near Finley's driveway appeared "chewed up" and that his fence was missing some panels;

3. pictures of T.G. taken at the hospital that showed bruising; and

4. expert testimony from the victim assistance specialist that domestic violence victims are often reluctant to report their abuse and often have trouble remembering details of their trauma.

Viewing this evidence, and considering the significance of T.G.'s testimony to the State's case, we are unable to conclude beyond a reasonable doubt that the trial court's error did not contribute to Finley's conviction. T.G. was the purported victim and sole eyewitness to the alleged assault. Thus, she was not only important to the State's case; she was its main witness. Without her testimony, the State's case would have been severely weakened because it had no other first-hand account of the offense. Such weakness is accentuated by the fact that—even with T.G.'s testimony—the jury was initially unable to reach a unanimous decision, returning its guilty verdict only after receiving an *Allen* charge.

Accordingly, we hold that the State failed to meet its burden establishing from other evidence that the error was harmless beyond a reasonable doubt. *Id.*

### III. CONCLUSION

A defendant's constitutional right to face-to-face confrontation—which includes allowing the jury to analyze the facial expressions of each witness—cannot be

dispensed with easily. Safeguards have been constructed to ensure that the right is infringed upon only when there exists an important and articulated reason to do so. And it is easy to see why: a witness's face conveys vital information to the jury about the veracity and reliability of their testimony. *See Mattox*, 156 U.S. at 242–43, 15 S. Ct. at 339. Allowing a witness's face to be obscured from the jury would, as the Court of Criminal Appeals has stated, "remove the 'face' from 'face-to-face confrontation.'" *Romero*, 173 S.W.3d at 505–06. It is for these reasons that we cannot overlook the trial court's error in allowing T.G. to testify while wearing a mask without articulating a sufficient, case-specific reason as to why it was necessary.

Thus, having held that the trial court erred and that such error was not harmless, we reverse and remand for a new trial.

/s/ Brian Walker

Brian Walker
Justice

Publish

Delivered: November 3, 2022

24